[Crim. No. 2094. Third Dist. Feb. 1, 1949.]

THE PEOPLE, Respondent, v. H. V. STONE et al., Appellants.

Richard J. Lawrence, Gordon A. Fleury, F. H. Bowers and Thos. F. Sargent for Appellants.

Fred N. Howser, Attorney General, Doris H. Maier and Gail A. Strader, Deputy Attorneys General, for Respondent.

THOMPSON, J.—The defendants were jointly indicted in Placer County in nine counts, the first of which charged a conspiracy to commit abortion, under section 182 of the Penal Code, and the succeeding seven counts charged them with the commission of abortions under section 274 of that code upon different named women. The ninth count charged the defendants with murder committed in the perpetration of abortion pursuant to section 182 of the Penal Code.

Before the defendants' pleas were entered, the first count of the indictment was amended under section 1008 of the Penal Code to charge that the conspiracy occurred one year earlier than it was originally stated. A continuing conspiracy through the years 1946 and 1947 is charged. Defendants' demurrer to the amended indictment, and their motion to set the indictment aside under section 995 of that code, were overruled and denied. Defendants' motion for separate trials under section 1098 of the Penal Code was denied. The defendants were jointly tried with a jury upon all counts, with the following result: All defendants were convicted of the first count of conspiracy. All defendants were acquitted of the ninth count of murder committed in the perpetration of abortion. H. V. and Marie Stone were acquitted of the second count of abortion on Esther Gonzales, and of the fifth count of abortion on Wilma Lefevre. H. V. Stone was also acquitted of the third, fourth, sixth, seventh and eighth counts. Jordan was acquitted of the third, fourth, sixth, seventh and eighth counts of abortion upon the persons named therein, but was convicted of conspiracy as charged in the first count, and of abortions as alleged in the second and fifth counts, upon the persons named therein. Marie Stone was convicted of abortions as charged in counts three, four, six, seven and eight, upon the several persons named therein. Judgment was rendered accordingly. H. V. Stone was sentenced to state prison for the offense of conspiracy as charged in the first count, for the term prescribed by law. Marie Stone was sentenced to state prison for the various offenses of which she stood convicted, for the terms prescribed by law, sentence for the fourth count to run consecutively with that of the

first count, and sentences for the sixth, seventh and eighth to run concurrently with the fourth. Jordan was sentenced to state prison for the offenses of which he was convicted in counts one, two and five, for the terms prescribed by law, count two to run consecutively with count one and count five concurrently with count two.

The defendants moved for a new trial of the offenses of which they were respectively convicted. Those motions were denied, with the exception that Marie Stone's motion for a new trial of the charge of abortion on Esther Darlene Gonzales under the third count was granted. The defendants separately appealed from the judgments of conviction, and from the orders denying their motions for a new trial.

Prior to the trial, petitions for writs of prohibition to prevent the Placer County Superior Court from trying the causes were denied by this court and by the Supreme Court. The transcript contains over 1,500 pages. The defendants failed to take the witness stand in their own behalf.

It is contended: That the court erred in overruling the demurrers to the amended indictment, in denying the motions to quash the indictment, and in denying the motions for severance of the trial; that the amending of the indictment was unauthorized without first resubmitting the causes to the grand jury; that the verdicts and judgments of conviction of the various offenses are unsupported by the evidence; that the verdicts of conviction of the charges of abortions each lacks adequate corroborating evidence; and that the court erred in the admission of testimony over objections, and in erroneously instructing and in refusing to instruct the jury with respect to essential elements of the crimes.

There is no merit in defendants' contention that the court erred in overruling the demurrers to the amended indictment, or in denying the motions to quash the indictment on the ground that the date of the conspiracy alleged in the first count was changed from January 1, 1947, to January 1, 1946, before the defendants' pleas were entered, without first resubmitting it to the grand jury. The offense of conspiracy alleged in the original indictment was not thereby changed. No other amendments were made. Such amendment is authorized to be made "by the district attorney without leave of court, at any time before the defendant pleads." (Pen. Code, § 1008.) No continuance of the trial was requested on that account, or at all. There is no showing that the defendants were prejudiced thereby. (*People* v. *O'Moore*, 83 Cal.App.2d

586, 591 [189 P.2d 554].) The statute of limitations for the indictment of a conspiracy to commit abortion does not expire until after three years from the date of its commission. (Pen. Code, § 800.) The change of the date of the alleged conspiracy did not affect the statute of limitations. The mere changing of the date of the conspiracy did not have the effect of charging another or different crime. Nor did it amount to the filing of a new indictment. The rights of the defendants were not prejudiced thereby. (*In re Davis*, 13 Cal.App.2d 109 [56 P.2d 302]; *People* v. *Anthony*, 20 Cal.App. 586, 590 [129 P. 968]; *People* v. *Marshall*, 99 Cal.App. 224, 229 [278 P. 258].)

The defendant, Jordan, contends that the motion to set aside the amended indictment should have been granted because there was no evidence before the grand jury to support a charge of conspiracy in 1946. We think the evidence before the grand jury does support the amended indictment in that respect. The original indictment charged the defendants with conspiracy under section 182 of the Penal Code to commit abortions contrary to the provisions of section 274. The alleged crime of conspiracy was an offense separate and distinct from the abortions charged in other counts of the indictment. Counts two and three charged the defendants with committing abortions on Esther Darlene Gonzales in April and in December of 1946. She was a witness before the grand jury and testified that Dr. Jordan committed an abortion on her at his office in Roseville, "In the Spring of 1946," and that another abortion was committed upon her at that office "about Christmas" in that same year. There was also evidence that the defendants operated that office where the abortions were committed during the year 1946. Equipment, implements, business cards and letters were taken from that office, indicating that the defendants conducted their business at that office. Business cards contained the names of Dr. and Mrs. Stone. Dr. Jordan was present when the contents of the office were seized, and he told the officers that property belonged to him. We are of the opinion the evidence before the grand jury sufficiently covers the charge of conspiracy in 1946, as alleged in the amended indictment.

The defendant Jordan assigns as error the sustaining of an objection to a question propounded to the witness Dan Nevis, on cross-examination: "Now, isn't it a fact, Mr. Nevis, that you were *responsible for the pregnancy* of Esther Gonzalves (Gonzales) on both the occasions in April and the

occasion in December when you took her to Roseville?" To that question the district attorney objected on the grounds that it was incompetent, irrelevant and not proper cross-examination. Defendant's counsel replied that "It shows the interest of the witness." The court asked for argument on that issue, and excused the jurors for that purpose and they then left the courtroom. Defendant's attorney stated that Nevis had been charged in El Dorado County with statutory rape of Esther Gonzales, and had pleaded guilty of that crime and was granted probation. He said *he had been informed* the period of probation should have expired March 9th, but that "he has not been released until this case is over." The district attorney replied that he knew the witness had been convicted of the crime and that he had been granted probation, but that he had no knowledge of when his probation would expire. He stated that he had had no communication with any of the officers of the El Dorado court about the Nevis case, and that he knew nothing of the terms of his probation. He then asserted that his office was in no way "holding up any expiration of his probation."

The court suggested that the defendants could, of course, impeach the witness by showing that he had been convicted of a felony. But defendants' attorney replied that "This is not impeachment. . . . This is on bias, interest, motive, state of mind." The court then sustained the objection to the question as to whether Nevis was *responsible for the pregnancy* of Esther Gonzales. The court did not even suggest that the defendants would be precluded from proving by the witness Nevis, or by the El Dorado records or by any other competent evidence that he had been convicted of a felony and granted probation, or what the terms of that probation were. We think the court made it clear that the ruling did not extend beyond the one question of responsibility for the pregnancy, to which the objection was sustained. After the jury returned, the witness Nevis was further cross-examined upon other facts, but he was not asked any questions regarding his former conviction, his admission to probation, or the terms thereof. There was absolutely no effort to prove that Nevis had been convicted of rape, that he had been granted probation, when that probation expired, or that the terms thereof would be affected in any manner by his testimony or his conduct in the trial of this case. It was not contended that Nevis was promised immunity or leniency with respect to his probation upon any conditions, or at all. The only

inference was that defendants' counsel "had been informed" the probation would have terminated on March 9th, but that it was extended until after this case was completed. But defendants made no effort to prove that fact. We conclude that the cross-examination of the witness, Nevis, was not unduly restricted. Even though the ruling on the objection to the one question of responsibility for the pregnancy may have been erroneous, it does not appear to have been prejudicial or reversible error.

The case of *People* v. *De Mello*, 28 Cal.App.2d 281 [82 P.2d 457], cited by appellants in support of the foregoing assignment of error is not controlling in this case. In that case, in which a judgment of conviction was reversed, the defendant and one Mendes were implicated in a charge of grand theft of some calves. Mendes was informed against for that crime and pleaded guilty to the charge. He was admitted to probation. It appears by competent evidence that one of the conditions of probation was *that he would cooperate with the district attorney* in testifying as a witness in the prosecution of his associate De Mello. The court sustained an objection in the De Mello case to defendant's offer of the Mendes record to prove that one of the terms of probation was that he should testify against De Mello upon his trial. The court there said:

". . . The trial court committed prejudicial error in precluding the jury from being apprised of all the conditions imposed on the accomplice in granting him probation."

In the present case it is not contended any such conditions of probation were imposed on the witness Nevis. ▆ In the absence of evidence to the contrary, or an offer to prove such wrongfully imposed conditions of probation, we must assume they did not exist. That proof was not offered or adduced. It may be true that if Nevis had been convicted of statutory rape on Esther Gonzales and that, at the time of this trial, he was on probation, which we assume were the facts, it would be competent evidence to prove those facts as tending to show his interest in the outcome of this case for the purpose of discrediting his testimony. Nevis did testify, in effect, that he took Esther to Doctor Jordan's office in Roseville for the purpose of procuring an abortion, and that he paid the fees charged for that service. But the ruling of the court on the question of whether the witness was "responsible for the pregnancy of Esther Gonzales" in no way precluded the defendants from proving on further cross-examination or by means of other competent evidence the prior conviction of

Nevis and the existence of probation at the time of this trial. The defendants failed to present that proof. They may, therefore, not complain of the absence of that evidence.

The appellants contend the court erred in receiving evidence, over their objections, of testimony regarding a large quantity of Dorex soap seized by the officers at their place of business in Roseville, together with casks, tubes, bottles, containers, labels and advertising matter, used by them incident to what the prosecution contended was an enterprise of selling and dispensing that compound for use in procuring unlawful abortions. It is insisted Dorex soap may be used for lawful purposes, and that there is no evidence that it was sold by them locally or elsewhere for the unlawful procuring of abortions or at all. Defendants' motion to strike that evidence from the record was denied. They earnestly assert that evidence was highly prejudicial. The attorney general claims that the evidence was competent as tending to show, not only that the defendants kept that soap on hand for use, but actually used it in procuring the abortions with which they were charged, and that they were engaged in the unlawful enterprise of selling it for that purpose.

We are of the opinion the evidence of the possession and use of a large quantity of Dorex soap by the defendants was competent as tending to show the conspiracy and the abortions charged against them. It is true the evidence fails to show actual sales of the soap. It is also true that the soap may be used for lawful purposes. There is, however, substantial evidence of expert witnesses that Dorex soap, which is used in the form of liquid or paste, containing potassium, iodide and alkali, which render it quite penetrating and potent as an agency for destroying the fetus, is commonly used in procuring abortions. In fact, a competent expert, who analyzed samples of Dorex soap taken from the large stock in possession of the defendants, testified that it was not only used for the purpose of committing abortions, but that he knew of no other purpose for which it was used. Several barrels and numerous crates of tubes, jars and bottles of that soap were taken from the Roseville building where the defendants operated. It is very unusual for doctors to keep in stock such large quantities of that soap if they merely use it for legitimate purposes in their regular legitimate practice of medicine. It seems immaterial that no actual sales of that soap in California or elsewhere were proved. The seven specifically enumerated overt acts incident to the first charge of conspiracy

included not only allegations of the use and sale of drugs and compounds designed to procure abortions, but also numerous other overt acts constituting evidence of the conspiracy.

In support of the competency of that evidence we find that Esther Darlene Gonzales, who went to defendants' place of business in Roseville in 1946 to obtain two separate abortions, testified that, on one occasion, an instrument was used with which ''a fluid'' was injected ''into the womb.'' Irene Mocettini, upon whom an abortion was committed by Dr. Jordan and Mrs. Stone in April, 1947, at their place of business in Roseville, testified that she saw a yellow fluid, taken in an instrument from a bottle, which was injected into her uterus. A bottle of Dorex soap was taken from the defendants' place of business in Roseville and marked, at the trial, for identification, as People's Exhibit 81. Roy B. Johnson, an expert laboratory chemist who is employed by the Affleck Laboratories at Sacramento, testified that he analyzed a sample of Dorex soap taken from that bottle, and found that it contained iodides and other ingredients foreign to ordinary soap. Iodides is defined as salts of hydriodic acid. It is a potent irritant. The chief expert witness on that subject, regarding the contents and use of Dorex soap, was Doctor Ralph W. Weilerstein of Berkeley. He was eminently qualified by training and experience as a physician and chemist. He is serving on the medical staffs of the Permanente Hospital Foundation of Oakland and the Herrick Memorial Hospital of Berkeley. For several years he acted as chief medical expert of 11 western states for the National Foods, Drugs and Cosmetics Department of the United States government. He testified that Dorex soap was taken from the office of Dr. Jordan at Roseville, analyzed in his laboratory and found to contain, among other ingredients, specified percentages of iodide, potassium, alcohol and alkali. He fully explained the caustic effect of the use of such ingredients in the form of liquid or jellied soap when injected, by means of a syringe or applicator, into the uterus of a pregnant woman. He said that these ingredients, combined with the soap, when injected into the uterus, has a ''penetrating effect to kill the fetus.'' He testified that ''Dorex soap is used by abortionists to do abortions,'' and that he knew of no other purpose for which it is used. When he was asked ''Do you know of any other use for it?'' he replied, ''Not except by abortionists.''

We are convinced that the evidence of the possession of a very large quantity of Dorex soap by the defendants at the

Roseville office where they committed the abortions of which they were convicted, was competent as tending to show it was kept by them for the unlawful purpose of procuring abortions. We also think the evidence adequately shows that Dorex soap was actually used by them as a means of procuring some of the abortions with which they were charged. It follows that defendants' objections to that evidence were properly overruled, and the motion to strike it from the record was properly denied.

It has been uniformly held that the possession of instruments, drugs or equipment commonly used by individuals in the commission of the crimes with which the accused persons are charged, is competent evidence tending to show their guilt, and that the weight to which it is entitled is to be determined by the jury. (*People* v. *Gonzales,* 20 Cal.2d 165 [124 P.2d 44] ; *People* v. *Schmidt,* 33 Cal.App. 426 [165 P. 555].)

Defendants' proposed instruction number 22 with relation to the possession and use of Dorex soap was properly refused. It contained a positive, unqualified statement that the "possession of Dorex Soap is not unlawful under any of the charges set forth in the Amended Indictment." That statement is misleading. The sixth alleged overt act charged in the first count of conspiracy in the amended indictment asserts that the defendants "manufactured and concocted . . . certain preparations, drugs and compounds designed and used for the purpose of aborting women." There is evidence that it was possessed by the defendants in large quantity. The undisputed evidence of Dr. Weilerstein was that Dorex soap injected into the uterus of a pregnant woman was likely to result in an abortion, and that he knew of no other purpose for which that soap could be used except to commit abortions. Two women upon whom abortions were committed by some of the defendants testified to the injecting of a yellow fluid taken from their stock on hand. Under the circumstances of this case the jury had a right to determine whether that compound or preparation of soap was unlawfully possessed by the defendants as a circumstance tending to prove the charge of conspiracy, and whether the yellow fluid which was injected into the uterus was in fact Dorex soap. We are convinced that it was. Conceding the balance of that instruction to be a correct statement of the law, that first sentence, above quoted,

is misleading and erroneous. The proposed instruction was therefore properly refused.

The case of *People* v. *Darby,* 64 Cal.App.2d 25 [148 P.2d 28], upon which appellants rely in support of their contention that the court erred in receiving evidence of possession by the defendants of the Dorex soap and certain instruments, is not controlling under the circumstances of this case. In that case a conviction of the crime of abortion was reversed on account of several prejudicial errors in the course of the trial. One of those errors consisted of receiving in evidence, over objection, a letter from Dr. Woods to Dr. Farber, in which the former, who had examined the uterus of the patient, which had been removed after the alleged abortion had been committed, stated therein his conclusion that the uterus had been ruptured. It was properly held that letter was hearsay and incompetent. Clearly, it was prejudicial because it inferred that someone had been attempting to commit the alleged abortion, and had ruptured the uterus. The court further said, at page 33, that: "The letter should have been excluded as being hearsay and for the further reason that no foundation had been laid to establish Dr. Woods' qualifications as a pathologist." Another error leading to the reversal was the admission in evidence, over objection, of hypodermic needles which were packed in their *original cellophane wrappers,* indicating that they had never been used by the defendant in the commission of the alleged abortion, or at all. Moreover, an instruction was erroneously given to the jury of a statute prohibiting the possession of such needles by persons other than certain specified professional men, to which classes the defendant did not belong. We are satisfied the Darby case has no application to the facts of this case.

We are also of the opinion the other cases cited and relied upon by the appellants upon that issue are likewise clearly distinguishable from the facts of this case.

The appellants contend that the court erred in giving and refusing to give several instructions involving the rule with respect to the necessity of corroborating the testimony of accessories. The appellants assert that the women upon whom the abortions were committed *are accessories* to the crime charged of a *conspiracy* under section 182 of the Penal Code *to commit abortions,* even though they may not have been accessories to the actual abortions which were committed, and that the court therefore erroneously refused to give to the jury some five proposed instructions to that effect.

■ The jury was properly charged in the prosecution's instruction number 40 that:

"I instruct you as a matter of law that no one of the several women who testified respectively that she had submitted to an abortion at the premises in question is to be viewed by you as an accomplice. No one of said persons is an accomplice to any of the offenses charged in the indictment herein or with either of the defendants charged herein as to the offenses charged by the indictment."

The court refused defendants' proposed instructions numbers 19, 40, 60, 61 and 62, charging, in effect, that the women upon whom the abortions were committed, *are accessories* as a matter of law, to the offenses with which they are accused. ■ Number 19 charged the jury in the language of section 275 of the Penal Code, which defines a crime separate and distinct from the offenses with which the defendants were indicted under section 274, that every woman who solicits and takes any drugs, medicine or substance whatever to procure an abortion, or who submits to an unlawful abortion, is guilty of a crime and punishable by imprisonment in the state prison. It was properly refused. ■ Number 40 correctly states that the defendants may not be convicted of abortion under count three of the indictment, upon Esther Darlene Gonzales, upon her uncorroborated testimony alone, but only if "such facts . . . be established by evidence other than and in addition to" her testimony. It was covered by another instruction which was given. Number 60 charges that, in the alleged crime of conspiracy to commit abortions under the first count of the indictment, the named women upon whom abortions were alleged to have been committed and other named witnesses, "are accessories" to that conspiracy, and that the defendants may not be convicted of that crime unless the evidence of those named persons is corroborated by other competent evidence. Number 61 charges that, upon trial for conspiracy to commit an abortion, "any woman who voluntarily solicits and submits to . . . an abortion upon her, is a coconspirator and accomplice" in that crime, and that the defendants may not be convicted thereof unless the testimony of such accomplices and coconspirators is corroborated by other competent evidence. Number 62 charges the jury that, upon trial of one who is accused of committing an abortion, "the defendant cannot be convicted upon the testimony of the woman upon . . . whom the offense was committed, unless she is corroborated by other evidence." Defendants' said

instructions numbers 40 and 62 were adequately covered by their instruction number 58, which was given in the language of section 1108 of the Penal Code. The last-mentioned instruction, which was given to the jury, reads:

"Under the law of this state, upon a trial for procuring or attempting to procure an abortion, the defendant may not be convicted upon the testimony of the woman upon or with whom the offense is alleged to have been committed unless her testimony is corroborated by other evidence. The corroboration required by the law must do more than raise a mere suspicion against the defendant, but it is sufficient if by itself it fairly and logically tends to connect the defendant with the commission of the alleged offense. Such corroboration may be provided by the testimony of another witness, by evidence showing the circumstances surrounding the alleged transaction, or by the testimony or the admissions, if any, of the defendant."

The last quoted instruction substantially conforms to the provisions of section 1108 of the Penal Code, which reads in part:

"Upon a trial for procuring or attempting to procure an abortion, or aiding or assisting therein, . . . the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence."

. The foregoing section does not determine or mean that, merely because the testimony of a woman upon whom an abortion is committed must be corroborated, she is therefore necessarily *an accomplice* to that crime. It merely means that the particular offenses mentioned in that section require some corroborating evidence to justify a conviction of the perpetrator of the crime. The woman who voluntarily submits to an abortion is guilty of one crime under section 275, and the person who unlawfully commits the crime is guilty of an entirely separate and distinct offense prohibited by section 274. (*People* v. *Clapp*, 24 Cal.2d 835, 839 [151 P.2d 237].) She is not an accessory to the crime of abortion under section 274 because she does not provide or personally use the drugs or instruments or commit the acts defined by that section, in a charge of an abortion. Our Supreme Court has recently clearly made that distinction. The term "accomplice" is specifically defined in section 1111 of the Penal Code. It reads, in part:

". . . An accomplice is hereby defined as one who is liable to prosecution for the *identical offense charged against the defendant on trial* in the cause in which the testimony of the *accomplice* is given." (Italics added.)

Under the evidence in this case it clearly appears, without conflict, that the women upon whom the abortions were committed could not have been jointly charged or convicted of either the conspiracy or the abortions under section 274 of which the defendants were convicted.

▮ The other instructions numbers 60 and 61 were properly refused because each of them erroneously charged the jury that the women upon whom the abortions were committed "are accomplices" as a matter of law, regardless of the evidence adduced.

Our courts have recently held definitely that a woman who voluntarily submits to an abortion is not, as a matter of law, an accessory to the crime of abortion charged under section 274 against another person. (*People* v. *Wilson*, 25 Cal.2d 341, 346 [153 P.2d 720]; *People* v. *Clapp, supra; People* v. *Malone*, 82 Cal.App.2d 54, 68 [185 P.2d 870]; *People* v. *Alvarez*, 73 Cal.App.2d 528, 531 [166 P.2d 896]; *People* v. *Wilson*, 54 Cal.App.2d 434, 446 [129 P.2d 149].)

The rejected instructions, numbers 60 and 61, specifically referred to and characterized the said women as *accessories* to the alleged crime of conspiracy. ▮ Upon the reasoning of the last cited authorities, which hold that a woman who submits to an abortion is not an accessory to the crime of abortion prohibited by section 274, it necessarily follows that, under the undisputed evidence of this case, that woman could not be an accessory to the crime of conspiracy charged against the defendants in the first count of the indictment. The indictment specifically charged the defendants with conspiring to commit abortions prohibited *under section 274 of the Penal Code*. If, upon a charge of abortion committed contrary to section 274, the woman who submits thereto is not an accessory, certainly she would not be an accessory to an alleged conspiracy with other named defendants to commit that same abortion. The crime of abortion and that of conspiring to commit an abortion are separate and distinct offenses as provided by the California statutes. In *State of Minnesota* v. *Tennyson*, 212 Minn. 158 [2 N.W.2d 833, 139 A.L.R. 987], it is said:

"Where the acts of several participants are declared by statute to constitute separate and distinct crimes, the partici-

pants guilty of one crime are not accomplices of those who are guilty of a separate and distinct crime. . . . The plain reason is that an accomplice must participate or be concerned in the commission of the specific crime with which the defendant is charged. The test is whether or not the alleged accomplice could be indicted and punished for the crime with which the accused is charged.''

See also 1 Corpus Juris Secundum, section 35, page 338, in which a statement of the rule with respect to accessories in abortion cases, in accordance with the foregoing conclusion, is supported by numerous authorities from various jurisdictions.

We conclude that the women upon whom the abortions in the present case were performed are not accessories to the alleged crime of conspiracy to commit those offenses. We are of the opinion the numerous cases cited by the appellants on the subject of conspiracy are not in conflict with what we have previously held in that regard.

The appellants contend that the court gave to the jury inconsistent and misleading instructions with respect to the application of the foregoing rule regarding accomplices. We think not. ▆▆▆ In the prosecution's instruction number 44, which was given to the jury, it was charged that ''If you should find that any witness in this case was an accomplice, the testimony of that witness may be *corroborated* by the testimony of the aborted woman either alone or in connection with other evidence, provided that such evidence meets certain requirements now to be stated.'' The jury was fully and properly instructed as to the necessary character of that corroborating evidence. That instruction applied to such witnesses as Dan Nevis, previously mentioned, who took Esther Gonzales to Dr. Jordan to aid her in procuring an abortion, and who paid to him his fee in the sum of $100 for that service. Clearly Nevis was an accomplice in that crime.

▆▆▆ The appellants assert that the court inconsisently charged the jury, in their instructions numbers 33 and 35, that Dan Nevis ''was an accomplice'' as a matter of law. The last-mentioned instructions were offered by the defendants. They were favorable to them. Even though the question of whether Dan Nevis was an accomplice under the evidence adduced, should have been left for the determination of the jury, the defendants may not complain of the court's charge that he was an accomplice as a matter of law, since those instructions were offered by them, and they were favorable

to them. They were therefore not prejudiced thereby. Those instructions were applicable, since the undisputed evidence was that Nevis took Esther Gonzales to the defendants to procure an abortion, and he paid their fees for that service.

 It may not be said that merely because Nevis was an accomplice in the commission of an abortion under section 274 that therefore the woman upon whom that abortion was performed was also an accomplice. The preceding cited California authorities on that subject determine otherwise. Those cases clearly draw that distinction. We conclude that the challenged instructions were not inconsistent or prejudicial.

We have examined the record and are of the opinion the various crimes of which the defendants stand convicted are adequately supported by the evidence. It would extend this opinion to unwarranted length to attempt to recite the numerous facts and circumstances contained in a very lengthy and complicated record, from which we draw the conclusion that the evidence supports the verdicts and judgments of conviction. We shall therefore not attempt to do so.

 The district attorney was not guilty of prejudicial misconduct in briefly examining the witness, Teresa Davis, who was not one· of the women upon whom the defendants were charged in the indictment with committing abortions. She testified that she went to Dr. Jordan's office in April, 1947, to procure an abortion. She was asked, ''Who did you see when you were there?'' The defendants then objected to her evidence as incompetent and prejudicial. The jury was excused, and the purpose of her examination was discussed. The district attorney offered to prove that her abortion was committed by the same means of injecting into her womb with a syringe the Dorex soap solution in the same manner that defendants committed abortions on some of the women involved in the charges of the indictment. The purpose was to show that defendants followed the same system and manner of customarily performing abortions. That was objected to and the matter was elaborately argued, with the citing of authorities. After elaborate arguments the district attorney concluded that it was a close question of law as to whether or not the evidence was competent. He therefore stated that he would withdraw the witness and ask no further questions. Defendants' attorneys announced that they did not desire to cross-examine the witness on the brief testimony which she had given. The jury was returned to court. Defendants'

motion to strike the evidence from the record was granted, and the jury was instructed to disregard it.

We are convinced the district attorney was in good faith in calling the witness and in offering to prove a uniform system and means by which the defendants committed abortions. It is not necessary to determine whether such evidence would be competent. That might depend upon whether it would fairly tend to prove a uniform system or that the same means or instruments were employed in defendants' customary method of operating. We are convinced the jury could not have been thereby prejudiced under the circumstances of this case. The evidence was offered in good faith. It was stricken from the record, and the jury was directed to disregard it. We think it was not prejudicial misconduct or reversible error.

We shall now consider the separate appeals of Dr. H. V. and Marie Stone with respect to other issues raised by them.

 Upon their separate appeals it is contended there is no evidence to connect either of them with unlawful abortions in 1946, or of any offense prior to April 30, 1947, at which time an abortion was alleged to have been committed by the defendants on Irene Mocettini. It was alleged in the second and third counts that abortions were committed by the defendants on Esther Gonzales on April 15, 1946, and on December 20, 1946. The first one was committed by Dr. Jordan. The second one was committed at their office by a woman whom the witnesses failed to identify. But Dr. Stone was acquitted of all charges of abortion. Marie Stone was acquitted of the second count in which an abortion was alleged to have occurred on April 15, 1946. She was convicted of the third count, but her motion for a new trial on that count was granted. Therefore it is immaterial as to whether either Dr. Stone or Marie Stone was identified as being connected with either of those alleged abortions. The defendants failed to take the witness stand in their own behalf.

Marie Stone stands convicted of conspiracy, and of four counts of abortion, namely, the fourth, six, seventh and eighth counts. They were alleged to have been committed: April 30, 1947, on Irene Mocettini; on June 28, 1947, upon Ida McClatchy; on September 7, 1947, on Eugenia Tedrowe; and on October 13, 1947, on Marie Caplinger. Irene Mocettini testified positively that Marie Stone made the examination and performed the operation upon her at their office on April 30, 1947. Ida McClatchy testified that she talked with Dr.

Stone at the office on June 28, 1947, about the abortion to be performed on her, and that Marie Stone "used the instruments" with which the abortion was committed. Eugenia Tedrowe testified that she visited the office on the date charged for the purpose of procuring an abortion, and that she met and consulted with both Dr. Stone and Marie Stone, but that Mrs. Stone actually performed the operation. Marie Caplinger went with her husband from their home in Marysville to the office of the defendants on the date charged, to procure an abortion. The husband was not present when it was performed. After the abortion they returned to their home in Marysville. In response to a telephone call, stating that she was seriously ill, Dr. Stone went to visit the patient at her home in Marysville. Upon his advice she was taken to a hospital at Marysville and soon thereafter died as a result of the operation. Austin Caplinger, husband of the deceased woman, testified that Dr. Stone came to see his wife and stated that "he and his wife" performed the abortion. The fees which were charged for that operation, in the sum of $200, were subsequently returned in currency, which had been placed in an envelope and left under the door of their home.

Business cards containing the names of Dr. Stone and Marie Stone, together with letters from Dr. Stone to Dr. Jordan, were taken from their office and received in evidence. There is adequate evidence to identify and connect both Dr. Stone and Marie Stone with the offenses of which they were convicted. Even if the evidence be insufficient to connect Dr. and Marie Stone with the conspiracy in 1946, that is immaterial for the reason that a continuing conspiracy was alleged which covers all the transactions involved during both 1946 and 1947.

We conclude there is adequate evidence to connect both Dr. Stone and Marie Stone with the commission of the crime of conspiracy, and also to connect Marie Stone with the commission of the crimes of abortion of which she stands convicted.

These appellants contend it was prejudicial error to admit in evidence certain surgical instruments, including irrigators, dilators, vaginal speculums and uterine packers. It is asserted they were taken from the bedroom of Dr. Jordan, and not connected with their use by Dr. or Marie Stone. But we are pointed to no evidence to that effect. We may assume the instruments were competent as tending to show the conspiracy between all three defendants. They were cer-

tainly competent against Dr. Jordan on the charge of abortion.

The independent acts, declarations or conduct of any one conspirator performed in furtherance of the conspiracy are admissible and competent against each conspirator. (*People* v. *Harper,* 25 Cal.2d 862, 870 [156 P.2d 249]; *People* v. *Stoddard,* 48 Cal.App.2d 86, 89 [119 P.2d 160]; *People* v. *Creeks,* 170 Cal. 368, 374 [149 P. 821]; *People* v. *Benenato,* 77 Cal.App.2d 350, 356 [175 P.2d 296].) But even if the instruments were applicable only to the charges against Dr. Jordan, which we do not concede, they were received in evidence without any request on the part of Dr. Stone or Marie Stone to limit that evidence to the charges against Dr. Jordan. The right to limitation of that evidence was therefore waived. It is conceded those surgical instruments were found in the possession of Jordan.

The authorities cited by those appellants in that regard are not in point. In *People* v. *Hill,* 123 Cal. 571 [56 P. 443], relied upon by these appellants, a judgment of conviction of the defendant for the crime of murder was reversed. The defendant had leased a ranch to Theodore R. Parvin. They subsequently met in or near the corral and quarreled over the cultivation of the land. The father of the defendant was working near by. He testified that he saw the deceased with upraised arm, in the attitude of striking the defendant with a hammer which he held in his hand, and that "the defendant struck him [Parvin] across the head with the stick which he had picked up." That evidence indicated that the defendant struck the deceased in necessary self-defense. There was no substantial evidence to the contrary. Parvin died as a result of that blow. A conspiracy to commit the offense charged was not involved. There was a serious question as to just where the affray occurred in the corral. A witness by the name of McClure said that after the affray was over and all parties had left, he went to the corral and searched for a weapon. He found in the corral "a two by four scantling about three feet long lying on the ground." That piece of timber was received in evidence over the objection of the defendant. The Supreme Court evidently seriously doubted the defendant's guilt, or at least the sufficiency of the evidence to convict him. After discussing assumed errors of trial the court said:

"The court also erred in permitting the club which McClure found in the corral to be received in evidence and exhibited to the jury. There was no evidence identifying the stick as

the one with which the defendant struck the deceased, *or in any way connecting the defendant with it."* (Italics added.)

That case is not in point. The stick, which was erroneously received in evidence, was in no way connected with the defendant. No witness saw it in his possession. In the present case the surgical instruments in question were taken from the possession of Jordan, one of the coconspirators on trial.

■ There is sufficient corroboration of the testimony of Irene Mocettini of the abortion upon her, as charged in count four, by Marie Stone at the office of Dr. Jordan, on June 28, 1947, to conform to the requirement of section 1108 of the Penal Code. Irene testified positively that she was pregnant and that she went from Sacramento to Dr. Jordan's office in Roseville on that date to procure an abortion; that she then talked with Marie Stone, who made the examination and performed the operation, and that in so doing she injected some fluid into her uterus. She said that she went to that office in an automobile driven by her sister Grace, who returned for her the following day. Grace, who was an extremely unwilling witness, testified that she drove her sister, Irene, to Dr. Jordan's office in the spring of 1947, where she left her, and that she called for her at the same place the following day. Grace signed a written statement of material facts concerning the purpose of that visit, some of the contents of which were used, by permission of court, to impeach her apparent contradictory statements on the witness stand. Grace read the statement and acknowledged that she signed it, and that she made the statements contained therein, with the exception that she said it did not then contain the name of Dr. Jordan, as the person whom she met on that occasion. She was asked if she did not state, among other things, that "Dr. Jordan told me that if anyone asked what was wrong with Irene to tell them that she had a miscarriage?" to which she replied, "I think I answered your question a while ago." The answer to which she referred was an admission that she made the statements contained therein, with the exception of naming Dr. Jordan, with whom she talked. She then further replied, "I don't remember the exact words the man said." The corroborating fact remains that Grace took her sister to Dr. Jordan's office where Dr. and Marie Stone operated their abortion business, on June 28, 1947, for Irene to procure an abortion, and that she returned to that office for her sister on the following day. ■ Moreover, the possession of a large quantity of Dorex soap which was taken from that

office furnishes some corroboration of Irene's testimony that Mrs. Stone performed the abortion by injecting a fluid into her uterus. We think the corroboration is adequate to comply with the statute.

We have also carefully examined the record, and are satisfied there is sufficient corroboration to sustain the conviction of Marie Stone of abortions under count six upon Ida McClatchy on June 28, 1947, upon Eugenia Tedrowe, on September 7, 1947, under count seven, and upon Marie Caplinger on October 13, 1947, under the eighth count. With respect to the abortion on Ida, under count six, her husband George McClatchy testified he drove his wife from Sacramento to the office of Dr. Jordan on the date charged, for the purpose of procuring the abortion; that she entered and remained there for about two hours, that he furnished her $250 with which to pay for the operation; that she was afterward in great pain and that they consulted a physician in Oakland by the name of Andrew Davis. Dr. Davis testified that he examined Ida on July 5th and found evidence of "an incomplete abortion" which had recently been attempted, and that the patient was then suffering from the shock of the operation. Ida's evidence of the abortion was very complete. She identified Mrs. Stone as the woman who performed it. Regarding the abortion on Eugenia Tedrowe, her husband, Joseph, testified that she was pregnant and that they drove from Santa Cruz to Dr. Jordan's office in Roseville to procure the abortion on September 7, 1947; that he paid the bill for the services, and that she was subsequently treated by Dr. Allen Pederson of Santa Cruz. That doctor testified that he examined her on September 11th, and treated her. He described her condition, saying that he found "there was tissue protruding from the cervix of the vagina." Mrs. Tedrowe testified that she first consulted Dr. Stone at his office, but that Mrs. Stone performed the abortion. Regarding the abortion on Marie Caplinger on October 13, 1947, as charged in the eighth count, as a result of which she subsequently died, we have previously discussed the evidence to some extent, and held there was sufficient corroboration. Her husband testified to several corroborating circumstances. They lived in Marysville. After returning from Roseville, on account of her severe pain Dr. Walter Schmidt, of Marysville, was called and thoroughly examined her and treated her. He testified that he diagnosed the case as the result of an abortion which she told him had been performed "the day preced-

ing'' his examination. We conclude the evidence corroborating these women upon whom the abortions were performed is adequately established to conform with the statute.

The remaining contentions of these appellants have been previously determined in this opinion adversely to them.

We conclude that each defendant was fairly tried and convicted of the offenses of which they stand convicted; that the jury was fully and properly instructed on all material issues involved; that there was no miscarriage of justice; and that the record contains no reversible error.

The judgments of conviction and the orders from which the appeals were taken are affirmed.

Adams, P. J., and Peek, J., concurred.

Appellant Jordan's petition for a rehearing was denied February 16, 1949, and appellant H. V. Stone's petition for a hearing by the Supreme Court was denied February 28, 1949. Carter, J., and Schauer, J., voted for a hearing.