[Crim. No. 2636. First Dist., Div. One. May 16, 1950.]

THE PEOPLE, Respondent, v. DAN CURRY et al.,
Appellants.

Gladstein, Andersen, Resner & Sawyer and Lloyd E. McMurray for Appellants.

Fred N. Howser, Attorney General, Clarence A. Linn and B. Abbott Goldberg, Deputy Attorney General, Edmund G.

Brown, District Attorney, and Frank Brown, Assistant District Attorney, for Respondent.

BRAY, J.—On charges of (1) assault with a deadly weapon with intent to commit murder and (2) robbery, the jury convicted both defendants of assault by means of force likely to produce great bodily injury, and of robbery in the first degree. Both defendants appealed from the judgments entered on the jury verdicts and from the order denying their motion for a new trial.

## Questions Presented

1. Alleged error in refusal to permit a *voir dire* examination of prosecuting witness to determine his competency. 2. Alleged error in admitting surgeon's testimony as to an operation. 3. Alleged error in excluding evidence of claimed beating of defendants. 4. Alleged error in admitting testimony of a probation officer as to statements made to him by defendant Jones. 5. Alleged misconduct of the district attorney in allegedly injecting the race issue.

## Evidence

Shortly after 10:15 on the evening of March 11, 1949, three men entered a liquor store at 1346 Pacific Avenue, San Francisco, accosted the proprietor, Victor Sambado, asking first for a wine which he did not have, and then saying: "It's a holdup." The men were standing as follows: the first leaning on the counter directly across from Sambado as he stood beside the cash register, the second to the side near two refrigerators, and the third man was at the door. Sambado testified that he had previously seen these men in the store. Sambado raised his hands and told the men to take it easy, take everything he had; he noticed that the second man, later identified as defendant Curry, was turning his gun around, holding it by the barrel; then he looked at the first man, Jones, in order to remember his appearance for identification, and was struck on the head. Sambado's cousin, Mrs. Firpo, heard a noise and came in to see what had happened, observed a man at the cash register; one of the men pointed a gun at her and said, "I will kill you," and then the three ran out. Mrs. Firpo could not identify the men.

While the robbery was in progress, Mr. Chilton and Mr. Gerber parked their car near the store and Mr. Chilton went in. Both Chilton and Gerber noticed a late model light colored Mercury car parked near the store facing west. Chilton

entered the store and then observed the robbery in progress, Sambado on the floor behind the counter. The men ran out past him, and he called Gerber, who phoned for the police. Chilton noticed that one of the men was wearing a round flat hat.

About this time Special Officer la Grande had been nearly run down at Pacific and Polk Streets by a light colored Mercury car containing three men. He reported the incident to a police patrol car from which a broadcast was put in for a ''cream colored Mercury sedan.'' Later another description of the car was given to the officers in the patrol car and relayed for broadcasting, and about the same time Officer Tucker who had gone to Sambado's store in response to the call from Mr. Gerber also had a broadcast made describing the holdup men and the car as a grey Mercury sedan.

The broadcasts were received by Officers Litt and Strange who were then on duty in their patrol car. After the first broadcast they followed and parked behind a grey Mercury car containing three young men, and had some discussion as to whether the occupants were the suspects after the men got out of the car and walked away. The officers drove away and returned when they received the second broadcast describing the suspected car as grey. They searched the car and waited for the absent occupants to return. The search disclosed a .38 calibre revolver without handles under the front seat, the matching handles in the glove compartment, and a tin cash tray on the rear floor. The tray was later identified by Sambado as one he had made himself and had used up to the time of the robbery.

After the search was completed Curry and Jones, two of the three prior occupants of the car, returned. Both officers had noticed Curry's ''pork-pie'' hat. The officers took the defendants across the street into a doorway, after accosting them with drawn guns, and questioned them. Both defendants denied knowledge of the car, although when confronted with various documents found in the car they admitted it was owned by Jones' father. It actually was owned by defendant Jones and his father. The defendants were then searched; about $93 including fifteen to twenty one dollar bills and some coins were found on Jones, most of the money in a roll in his pocket, and $15 in his wallet; about $75 including fifteen to twenty one dollar bills and some coins were found on Curry. Also found in Jones' jacket pocket were five .38 calibre short bullets fitting into the gun without grips. Jones denied that

any bullets were taken from his person. The key to the car was found on the sidewalk in the vicinity of the right rear wheel where Jones had been standing.

The defendants were taken to the police station and then to the emergency hospital where Sambado identified them as two of the men involved, and later again identified them at the Franklin Hospital. At the trial Chilton testified that he thought defendant Curry was the man he saw in the doorway at the time of the holdup, but he was not positive. Jones admitted that the witness Gerber identified the defendants on the night in question. Gerber did not identify them at the trial. Sambado testified that at the time of the holdup he had noticed that Curry had an odd looking gun, which at the trial he identified as similar to the gun without grips.

1. REFUSAL TO PERMIT EXAMINATION AS TO SAMBADO'S COMPETENCY.

 The blow which Sambado received on the night of the holdup caused a depressed fracture of the skull over the motor cortex. Defendants contend that as a result of the blow there was a gap in Sambado's memory and that they should have been permitted to examine him before he testified on direct examination to show that this gap was sufficient to cause him to be incompetent as a witness. In their opening brief they say: "Mr. Sambado was undoubtedly sane, able to understand the nature of an oath and to testify clearly all during the course of the trial. But his testimony discloses that there was a hiatus in his recollection of the events of the robbery and assault . . ." They base their claims of this gap on several facts: 1. that Sambado testified that subsequent to the accident his *right* leg became partially paralyzed, whereas Dr. Webb, a neurological surgeon who examined him the morning after the robbery, stated that the injury sustained would only involve the *left* leg. (This does not take in account the fact that another doctor who saw him about the same time testified that he had a clonus, an involuntary muscular action in both legs.) 2. Sambado exhibited a defect in speech—an aphasia—which could have resulted from a retrograde or an hysterical amnesia. This condition Sambado ascribed to an illness. 3. Sambado testified he was struck by a gun butt, but a policeman testified that Chilton (although at the trial he stated that when he first saw Sambado he was lying on the floor) had stated to him the night of the robbery that Sambado was struck by a bottle, and there were broken bottles on the floor. 4. Sambado

described the location of the man who struck him as being 4 feet away from him, and said that at the moment he was struck his head was up. Defendants argue that it would have been impossible for the man 4 feet away to hit Sambado on the top of the skull. In making this argument they overlook the fact that he was hit on the *rear* top of the skull. 5. The claim that Sambado filled in alleged memory gaps by ''needless and useless'' fabrication, in saying that he had seen the defendants twice before in his store and was suspicious of them, and in noticing details of Curry's moustache and yet failing to notice that Curry had grown a beard in jail. Defendants contended that in spite of Dr. Webb's testimony that Sambado showed no signs of retrograde amnesia, Sambado might have had it. It is obvious that all of the matters above set forth go to the witness' credibility rather than to his competency, and were matters for the jury to consider.

Defendants, on cross-examination, went into the matters which bore on the question of the alleged hiatus in memory. Sambado's answers showed ''that he was not incapable of receiving just impressions of the facts or of relating them truly.'' (See *People* v. *Mendez*, 193 Cal. 39, 48 [223 P. 65].)

It is conceded that Sambado was not incompetent to testify under the provisions of section 1880 of the Code of Civil Procedure. Defendants have offered no authorities for their contention that they were entitled to a *voir dire* examination of Sambado. The court's ruling in denying it was correct. (See 2 Wigmore, Evidence, 3d ed., §§ 485, 497 and 654.)

2. TESTIMONY CONCERNING OPERATION.

■ The neurological surgeon was asked if the morning immediately following the robbery he performed surgery on Sambado's skull. Defendants demanded that the prosecution make an offer of proof. There was considerable discussion in the absence of the jury, from which it appears that the prosecution wanted to show that the operation was performed with a local anaesthetic, that it was found that the damage was not a general damage to the brain itself, but only to the portion having to do with motor control of the body, that during the operation Sambado remained conscious and discussed the operation, and was clear mentally, to refute defendants' contention that Sambado may have had an amnesia retrograde and his mind might not have been clear at the time of his identification of the defendants immediately preceding the operation. The court overruled defendants' objection and the surgeon

then testified that he performed "surgery," using at first a local anaesthetic and later drug anaesthesia, that Sambado was normal and rational in every way and answered questions reasonably, that the surgeon searched for retrograde amnesia and found no evidence of it. There was no error in permitting this testimony. It bore directly upon the extent of the injury received by Sambado and his mental clearness at the time he identified defendants.

3. THE ALLEGED BEATING OF DEFENDANTS.

█ It was contended by defendants that on Monday following their arrest defendants were taken to the offices of the robbery detail of the inspectors' bureau of the police department and there questioned and beaten. The beating, it was claimed, was done by Police Inspectors Resnik and Wafer, who were witnesses in the case. Defendants demanded of the police department, sending a copy of the demand to the district attorney, that an investigation be made of their beating. Defendants contended that because of their demand for an investigation all police officers were prejudiced against them. Officer Litt was one of the officers who arrested defendants at their parked car and who testified to the objects found in the car and the denial at first by the defendants that they had any connection with the car. It is not claimed that Officer Litt participated in, or was present, at the alleged beating. On cross-examination, defendants were asking Litt as to whether he heard the testimony of Inspectors Reznik and Wafer before the referee of the juvenile court. He said he did. Defendants then asked if he heard counsel ask them if they were the police officers who had beaten defendants. An objection to this question was sustained. Defendants argued that by showing that Officer Litt had learned from the defense questioning of the inspectors that the defendants had claimed the beating and had caused an investigation to be made of their complaint, such knowledge would prejudice Officer Litt and cause him to color his testimony against the defendants. In other words, defendants were attempting to show knowledge by Litt of the fact of the complaint of defendants and the subsequent investigation, as bearing on the possible bias or prejudice toward defendants. Defendants were entitled to get such fact before the jury for what it was worth. They were not entitled, however, to ask the witness concerning what he had heard of the cross-examination of the witnesses in the juvenile court, except in case, upon asking the direct question of him as

to whether he had knowledge of the fact, he denied such knowledge. The objection was properly sustained to the question concerning the proceedings in the juvenile court. However, defendants then asked the witness if he knew that the defendants had been beaten by police officers. He replied, "How would I know that," and then the court sustained an objection to the question.

When defendant Jones was testifying on direct examination his counsel asked him if he had ever seen the money tray that Sambado had identified as having been on the cash register at the time of the robbery and which was found in defendant's car. He replied, "I seen it at the time I was being beaten by Inspector Reznik and Inspector Murphy [evidently intended Wafer]." The following then occurred: "Q. When was that? A. The 15th of March. Q. Where? A. Up in the Robbery Detail. Q. In this building? A. That's right. Q. You say, by Inspector Reznik. Do you see him in the courtroom? A. That is him in the brown suit (indicating). Q. Sitting beside the District Attorney here? A. Yes. Q. You say you were beaten. Will you tell us about that? Mr. Brown [assistant district attorney] : Objected to, Your Honor, as being incompetent, irrelevant and immaterial." The court sustained the objection. Thereupon counsel on both sides went into the judge's chambers, where defendants made an offer to prove that Inspectors Reznik and Wafer had beaten the defendants, that defendants requested of the chief of police an investigation of the beating, that an investigation was made by the district attorney's office, that it was because of defendants' complaint and the ensuing investigation that the charges in this case were filed against defendants, that no charges had been filed until after defendants made the complaint. The court then held that these matters were not relevant to the issues. Defendants' counsel then asked the witness when he was charged with the assault with intent to commit murder. Upon objection being made, the court stated that the charge was a part of the court record. Defendants' counsel then stated that the date was not there. Before the court could rule, he withdrew the question, stating that he did not think it was material. Defendants, of course, were entitled to bring out anything which might indicate bias, hostility or prejudice on the part of any of the witnesses in the case, but it had to be done by proper proceedings. Defendants could have offered the record to show the date of the filing of charges to compare with the date of the alleged beating.

Inspectors Reznik and Wafer were called in rebuttal to testify to admissions and statements made the Monday following the robbery, which were inconsistent with the stories told by defendants on the stand. On cross-examination they both denied beating the defendants. Reznik particularly denied striking defendant Jones in the right eye. They also denied that the next morning defendant Jones had any appearance of bruises, swelling of the right eye, or swellings or any other evidences of having been beaten. At this point Reznik was shown a picture of defendant Jones taken on Wednesday (two days after the alleged beating) concerning which picture defendant Jones had said on the stand, ''You will notice that my eye is almost closed. It was right after I was beaten.'' Reznik denied that the picture showed any evidence of a closed eye. Reznik was then asked if he had been questioned by any police officer about any claim that he had beaten someone. The court sustained an objection to this question. When Inspector Wafer testified defendants asked him if he helped Reznik beat up Jones on Monday morning. The court sustained an objection to the question, but allowed defendants to ask him if he had ever beaten either of the defendants. He denied that he had, or that Jones ever had any evidence of a beating. Likewise defendants were not permitted to ask him if he was questioned by an investigator concerning the alleged beating.

Defendants called one Garety, a member of the district attorney's staff, who apparently had been assigned by the district attorney to investigate defendants' complaints of the beating. He was not permitted to testify concerning an examination of the defendants on the first or second day after the alleged beating. Defendants offered to prove by the witness that they had been beaten and that the marks of the beating were still on them. Attorney McMurray, defense counsel, took the stand and offered to prove the appearance of defendants on the afternoon of the Monday when they claim they were beaten. The court sustained an objection to his testimony. Defendants' counsel then stated that he had present a witness with the records of the investigation, but would not call him if the court were not going to allow the records in evidence. The court stated that the records would not be admitted. The records of the investigation, of course, were not admissible. The fact of the investigation and the physical condition of the defendants were admissible for the purpose of having the jury

consider their effect, if any, on the credibility of the testimony of the police officers. The physical condition was admissible to refute the testimony of Officers Reznik and Wafer that defendants bore no evidence of beating.

It was error nor to permit defendants to show the fact of complaint against Officers Reznik and Wafer, and the fact that defendants showed evidences of beating, and not to permit questioning of Officer Litt as to his knowledge of the fact of the investigation. However, under the circumstances of this case the error was not prejudicial under article VI, section 4½, of the Constitution. Defendant Jones was permitted to testify to the fact that he was beaten. A picture which defendant Jones stated showed the evidence of the alleged beating was admitted in evidence and exhibited to the jury. No questions were asked by defense counsel of defendant Curry when he was on the stand as to whether or not he had been beaten, or whether Jones was beaten in his presence. The court did not rule that such questions could not have been asked. Apparently, although counsel constantly referred to the fact that both defendants were beaten, the emphasis was on the alleged beating of defendant Jones. The jury had the photograph before it from which to determine whether it supported defendant Jones' testimony as to the beating.

There can be no question but that the jury understood that defendants claimed to have been beaten by Officers Reznik and Wafer and that defendants were contending that all police officers who testified were motivated by bias against defendants because of complaints of the alleged beating. They undoubtedly weighed those contentions in their deliberations. Curtailment of examination on motives or bias of witnesses is not necessarily prejudicial. (See *People* v. *Stone,* 89 Cal. App.2d 853 [202 P.2d 333] ; *People* v. *Ilderton,* 14 Cal.App.2d 647 [58 P.2d 986].)

There was ample evidence to convict defendant without the testimony given by Inspectors Reznik and Wafer. The identification of defendants by Sambado was positive. In spite of defendants' claim of a hiatus in his memory, Sambado's testimony was clear, distinct and reasonable. The identification of the car, the presence in it of the tray which came from Sambado's store, the gun with the plastic handles removed, which resembled the weapon with which Sambado was hit, and all the other circumstances in the case, made the testimony of Officers Reznik and Wafer merely cumulative. It is not reasonable to assume that even if the jurors believed

that these officers had beaten defendants, such fact would have caused them to disregard the overwhelming evidence of defendants' guilt.

4. STATEMENTS TO PROBATION OFFICERS.

Juvenile Probation Officer Elliott was called by the prosecution in its case in chief. On objection by defendants, he was withdrawn and then called in rebuttal. He testified that it was his duty to investigate persons who were brought into the delinquency division; that on March 24 he had a conversation with defendant Jones in the city prison. This conversation was admitted over defendants' objection. He told Jones that "if he would be open with me and explain the situation, the more above-board he would be with me the more I could help him . . ." Jones told him that between the hours of 10 and 11 on the night of the robbery he was at the home of his aunt having come there after he had parked his car at the point where the officers found it. These statements substantially contradicted Jones' testimony that he had parked the car about 9:30, and gone to a gambling club where he remained until about midnight.

Defendants contend that the statements made to Jones were privileged, and confidential. This contention is based upon (1) section 1881, subdivision 5, of the Code of Civil Procedure, and (2) certain sections of the Welfare and Institutions Code.

Section 1881 of the Code of Civil Procedure provides: "There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person can not be examined as a witness in the following cases: . . . 5. A public officer can not be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure." Section 638 of the Welfare and Institutions Code provides for the probation officer to make an investigation "and keep a record in writing of such investigation. Such record shall not be open to public inspection nor shall any person be permitted to read such record, or any part thereof, except upon approval of the probation officer or the judge of the juvenile court." Section 639 provides: "The clerk with whom this report is filed shall not make it public; nor permit it to be inspected by any person except the parties mentioned therein, or their attorneys, unless the court before whom the proceeding is pending shall so direct by minute order, for good cause."

Defendants concede that there are no authorities on the sub-

ject in California and state that the subject is in considerable confusion outside the state, and that "the cases must be decided on their individual facts." As to the Welfare and Institutions Code sections the reference is to *records* and not communications. Moreover, section 638 does not provide for complete secrecy, for it provides in effect that the *record* may be open to the public and read by any person "upon the approval of the probation officer or the judge of the juvenile court." In *Stroud* v. *Hansen*, 48 Cal.App.2d 556 [120 P.2d 102], concerning reports of drivers involved in accidents required by section 484 of the Vehicle Code to be made, and prohibited by section 488 from being used as evidence, the court held that statements made by the driver to the officer were admissible, saying (p. 560) : "To make a *statement* privileged and inadmissible it must come within the express terms of the section." (Emphasis added.) Section 1881, subdivision 5, merely limits the disclosure to situations where the public interest would suffer by the disclosure. Actually the public interest would suffer by the failure to disclose statements made to the probation officer which are inconsistent with defendant's later sworn testimony.

As held in *Crosby* v. *Pacific S. S. Lines*, 133 F.2d 470, concerning section 1881, the witness is not the one to determine whether the disclosure would injure the public interest. "All reason says that the question is one for the court to determine." (P. 475.) In *People* v. *King*, 122 Cal.App. 50 [10 P.2d 89], cited by defendants, the prosecution claimed privilege under section 1881, subdivision 5, to prevent defendant from cross-examining a special agent of the National Automobile Theft Bureau concerning the location of a secret number stamped in a hidden place on the body of the car which location was known only to the manufacturer and the National Bureau. While holding that the information concerning these secret numbers is such a communication as to be privileged under the statute, it stated that because the witness had voluntarily testified concerning it in response to questions by the district attorney, defendant was entitled to examine the witness concerning its location. The case is not in point here.

 Section 638 of the Welfare and Institutions Code provides for an investigation whenever application is made for the drawing of a petition under the provisions of the Juvenile Court Law. It says: "If, after such investigation it appears to the district attorney or to the probation officer to whom report or complaint has been made that a petition should not

be drawn such district attorney or probation officer may refuse to draw such petition.''

It is obvious that the examination of the person involved is to determine whether probable cause exists for the drawing of the petition, and necessarily the facts evolved from and the statements made by him, are to be used against him. Statements made to the probation officer by a person accused of a crime upon which, with other matters, the determination of whether he is to be handled by the juvenile court or the criminal courts rests, cannot be confidential.

Nor was the statement made to defendant by Elliott to the effect that the more aboveboard defendant was with him the more Elliott could help him, any inducement which made defendant's statements to him inadmissible. The statements made were not confessions and hence no foundation of voluntariness was required. (8 Cal.Jur. 100; *People* v. *Ramirez,* 113 Cal.App. 204 [298 P. 60].) In *People* v. *Haney,* 46 Cal.App. 317 [189 P. 338], it was held that the admonition of police officers to a defendant that ''the truth would not hurt him, and he better come out and tell it; that they expected him to tell the truth'' (pp. 322-3) could not ''be construed as an inducement to a confession of guilt.'' (P. 323.)

There was no relationship between the probation officer and defendant Jones analogous to that of attorney and client. As pointed out by defendants, section 640 of the Welfare and Institutions Code provides that the probation officer shall be present in the juvenile court ''to represent the interests of each such person when his case is heard, and shall furnish to the court such information and assistance as the court may require'' and ''Before any such ward is recommitted, the probation officer shall inquire into the reasons assigned for such action and shall be present in court to represent the interests of such ward.'' However, that does not mean that he is to represent him as an attorney or advocate, nor that the probation officer may conceal from the state information obtained from the person in question. The officer's duty is to disclose to the court all knowledge he has concerning the case including that obtained from the person himself. Defendants rely on statements in 8 Wigmore on Evidence, 3d ed., § 2300a, to the effect that the privilege between attorney and client should be extended to the relationship between the client and nonattorney agents practicing before an administrative agency. The relationship between the pro-

bation officer assigned to a case in the juvenile court and the person involved in the case is in nowise similar to the relationship between a client and an agent before an administrative body. In *Samish* v. *Superior Court*, 28 Cal.App.2d 685, 695 [83 P.2d 305], the court said: "Since the protection against privileged communications often leads to a suppression of the truth and to a defeat of justice, the tendency of the courts is toward a strict construction of such statutes. (*Dwelly* v. *McReynolds*, 6 Cal.2d 128, 131 [56 P.2d 1232] ; 27 Cal.Jur. 44, sec. 30.)"

5. ACTION OF DISTRICT ATTORNEY.

 Defendants charge the deputy district attorney who prosecuted the case with prejudicial misconduct. In his closing argument defendants' counsel, referring to the arrest of defendants by Officers Litt and Strange, stated: "Well, ladies and gentlemen, I don't know how much you know about race prejudice, or about the sort of treatment that Negro people get when they run up against the law, ——" At this point the district attorney interrupted and objected to counsel bringing "up the question of race prejudice." After the court stated that it did not think that the question of race prejudice belonged in or had entered the case, the following occurred: MR. McMURRAY [defendants' counsel] : I wonder if you are bearing in mind the remark that the defendant Jones made on cross-examination when asked why he did not tell all to the Officers who had arrested him? You will recall he said, 'Colored boys, or Negro boys, arrested by Officers here, don't know what to expect.' THE COURT: The defendant Jones made statements as you are quoting it, but there is no evidence of anything on which you can base any statement of actual race prejudice that has entered in this case in any way. MR. McMURRAY : I will withdraw my remark, and I will say this: I don't know if you ladies and gentlemen have any appreciation of the fear that the defendant Daniel Jones expressed, the fear that Negro people have when they run afoul of the law in this town, or anywhere else. But if you do have any appreciation of it at all, you will understand why the defendants did not at that time, without knowing what they were up against, without having the faintest idea of what it was all about, explain to the Officers all about what they had been doing; and I think subsequent events proved that they were wise." Evidently desiring to answer these statements of counsel, the district attorney in his closing argument said: "If the Court please,

and ladies and gentlemen of the jury, speaking about old sayings with reference to police brutality, I can remember one that has run down through my family for quite some time and that saying, if I can say it without emotion, is the story about the little pickaninny that was playing with some white boys, and they would not play with him, so he had to go home and his old mother said, 'Little pickaninny, don't you cry. You stay in your own backyard and play.' And that thing has gone down through my family for years.'' Then the following occurred: ''MR. McMURRAY: Your Honor, I don't like to interrupt counsel any more than he likes to interrupt me, but I will assign as misconduct the use of the term 'pickaninny,' which is offensive to all Negro people, a term which implies that there is a difference between the whites and Negroes and a term which asserts that the whites are sort of —— MR. BROWN: If anybody —— THE COURT: I did not write in anything Mr. Brown said thus far—I haven't seen how you could reasonably write into it what you have just offered to explain as Mr. Brown's intention. Let's wait until he finishes. I don't know that thus far he has said anything. He used a term, and perhaps by way of illustration, —— MR. McMURRAY: I know how they feel. MR. BROWN: If he wants to take that attitude, that's all right as far as I am concerned. My feelings as far as this particular phrase is concerned, is one that is outstanding. And it is an expression of my views, and I think I am involved in the case because I am putting in the evidence before this court and jury. THE COURT: You see, I don't think that it is entirely fair to write anything into what Mr. Brown said, MR. McMURRAY: If he had used the word 'nigger' —— THE COURT: He didn't. Now just a minute. He did not use such a term. Why are you saying anything of the kind? MR. McMURRAY: I don't say he used it. THE COURT: I am not going to allow that term. I have never allowed it in this courtroom, and from your lips it is offensive to me, because of what you said about Mr. Brown. You have no right to talk that way. I resent it. Are you trying to write something in this case that is not in it at all? MR. McMURRAY: No, I am not, your Honor. THE COURT: Then let's forget the incident and see what Mr. Brown does, and I think thus far Mr. Brown has conducted himself properly. Proceed, Mr. Brown. MR. BROWN: What my family thinks is only important with regard to the evidence that I put on in this case, and I assure you, ladies and gentlemen, that it is not my intent

through the witnesses I have produced here, in one iota, to appeal to any prejudice which any of you might have, which I don't think you do have, because you answered the questions at the start of the case that you did not have any prejudice in that regard, and it has no place in this case.''

Just how the district attorney intended to apply the ''pickaninny'' story is not clear, but it is obvious from a reading of the entire incident that no prejudice resulted to the defendants. As far as the district attorney had proceeded he had not injected the race prejudice issue nearly as much as had defendants' counsel in his argument to the jury, and in his use of the word ''nigger'' in the discussion concerning the statement of the district attorney.

Judgments and order affirmed.

Peters, P. J., and Schottky, J. pro tem., concurred.