PEOPLE v. ROBERTS.

INDICTMENT AND INFORMATION—MOTION TO QUASH—CONFESSION—
  EVIDENCE—EQUALLY DIVIDED COURT.
    Denial of motion to quash information charging 15-year-old boy
      with murder, where his confession had been presented to ex-
      amining magistrate without objection and there was no testi-
      mony presented rebutting the presumption of its validity, is
      affirmed by an equally divided court.

Appeal from the Recorder's Court of the City of Detroit; Skillman (W. McKay), J. Submitted January 12, 1961. (Docket No. 65, Calendar No. 48,727.) Decided September 22, 1961.

Louis Roberts, accused of murder, appeals from order, at conclusion of preliminary examination, binding him over for trial and from denial of motion to quash information. Affirmed by an equally divided court.

*Paul L. Adams*, Attorney General, *Samuel J. Torina*, Solicitor General, *Samuel H. Olsen*, Prosecuting Attorney, *Samuel Brezner* and *Angelo A. Pentolino*, Assistant Prosecuting Attorneys, for the people.

REFERENCES FOR POINTS IN HEADNOTES
  3 Am Jur, Appeal and Error § 1160.

*Henry Heading,* for defendant.

DETHMERS, C. J. *(for affirmance).* Defendant, a 15-year-old Negro boy, is charged with murder. This is an appeal, before trial, from the trial court's order denying defendant's motion to quash the information. The motion was based on the claim that defendant's confession of guilt, received on preliminary examination through the testimony of the police officer to whom it was made, was not freely and voluntarily given. On appeal defendant contends (1) that the voluntariness of the confession presents a question of law for the court and not a question of fact for a jury when, as he contends here, the facts in connection therewith are undisputed, and (2) that the undisputed facts show that the confession was not free and voluntary and, inferentially, that without it there were insufficient proofs to warrant binding defendant over for trial.

(1) Defendant cites *People* v. *Barker,* 60 Mich 277 (1 Am St Rep 501), and *People* v. *Prestidge,* 182 Mich 80, for the proposition that the question whether a confession was voluntary is for the court, if the matter is clear and the testimony on the subject is undisputed, but if there is ground for doubt, the court may leave it to the jury to determine whether the confession should be considered. This is their holding. In both cases cited, however, the trial had been had, resulting in convictions. Here there has been no trial. When it is had there will be time enough for the trial court, as the question arises, to determine, on the state of the record then before it or on such further testimony on the subject as may then be adduced, whether the voluntariness of the confession should then be decided by the court or left for jury determination. From the court's ruling at such time, opportunity for application for leave to appeal will still be available.

(2) Should the confession have been excluded at preliminary examination and defendant discharged at its conclusion? It does not appear that defendant objected to introduction of testimony of the confession. All that the record discloses on the subject is that at the end of the examination, in response to the prosecutor's motion to bind over, defense counsel said merely that he had "token opposition" to that motion because he felt that the confession had been obtained through inducement by the police officer. As already stated, the subsequent motion to quash in the trial court was planted on the same ground.

We cannot agree that on the record at the conclusion of the examination the magistrate should have disregarded the confession and declined to bind over or that the trial court should have quashed the information on the ground that the confession had been admitted improperly before the magistrate. The pertinent testimony of the police officer, given at the examination, follows:

"*Q.* Now, did Louis Roberts tell you that he knew anything about the deceased, Patricia Cioffi, as to her decease?

"*A.* Yes, sir, he admitted that he stabbed and killed the girl. * * *

"*A.* He told me that on May 21st, at 10 o'clock * * * he observed this girl across the street. He followed her for awhile, and then he got in between a couple of homes, and he accosted her and asked her for a cigarette, and she did not give him no cigarette, and he, * * * or, his nearness forced the girl against a tree, and he started making love to her and kissing her. * * *

"*A.* And then he had her against the tree, and he was rubbing his body against her body, and kissing her, when somebody from across the street asked her if there was any help needed down there, and the girl got scared, and started screaming, and he

stabbed her once, and indicating about the heart, and then he ran away from there.   *   *   *

"*Q.* Well, did your investigation reveal that he had been arrested before June 16th?

"*A.* Yes, he had been.

"*Q.* And he has been interrogated previously?

"*A.* Well, I don't know whether you would call it arrest, but he had been interrogated by another team of detectives.

"*Q.* And he had been released, is that right, at that time?

"*A.* Yes, sir, that is right, and his grandmother was right there with him all the time.

"*Q.* So then the second time, as far as you know, that he was at the police headquarters, was on the 16th of June?

"*A.* I brought him there.

"*Q.* And that is the day that you and Mr. Rouell brought him down, is that right?

"*A.* That is right, yes sir.

"*Q.* And Mr. Rouell is your partner, is that right?

"*A.* That is right.

"*Q.* Now, the second time he was taken down, was the grandmother asked to come with him?

"*A.* No.   *   *   *

"*Q.* All right, and then you questioned him from around 9 o'clock (a.m.) until when?

"*A.* Until about 12 o'clock (noon).   *   *   *

"*Q.* Were you with him constantly, at all times, from 9 o'clock until 12 o'clock?

"*A.* Just about almost all the time, but I wouldn't say constantly. I may have walked out, or go down, or take care of a phone call, or something else, while he sat in the office there. but that was all.

"*Q.* I see. And shortly after you arrived at the police headquarters, you asked Louis Roberts,—or, you took his shoes off, is that right, one or the other?

"*A.* Yes, sir, that is right.

"*Q.* Were you ever alone with him during the time between 9 o'clock and 12 o'clock?

"*A.* Yes.   *   *   *

"*Q.* When you first started questioning him, he denied the killing, is that right?

"*A.* Oh, yes.

"*Q.* And you kept questioning him, because, for some reason or other, you didn't believe him is that right?

"*A.* That is right.

"*Q.* And you kept telling him, 'Stop lying, and come on and tell me the truth', is that right?

"*A.* I wouldn't doubt it that I said to him, 'Stop lying, and tell me the truth.'   *   *   *

"*Q.* Now, after you had been in the room with him for some time, and there was no one in there but you with him, did you tell him that he had a long time before him and that he was a young man, and that he was somewhat handsome?

"*A.* That is right.   *   *   *

"*Q.* And did you also tell him that it would be better for him if he would confess?

"*A.* Yes, sir.

"*Q.* And did you tell him you would take him to the juvenile home there?

"*A.* Yes, sir.

"*Q.* And while you were along with him, did you show Louis Roberts a nude picture of the deceased, lying on the slab in the morgue?

"*A.* Yes.   *   *   *

"*Q.* Now, when he allegedly confessed, were you alone with him then?

"*A.* Yes.   *   *   *

"*Q.* And how long after the alleged confession was it before you took him to the prosecutor's office.

"*A.* As soon as I possibly could take him upstairs. I called the prosecutor, and went right upstairs with him.

"*Q.* Did you ask for a specific prosecutor, or did you just want any prosecutor?

"*A.* I took Louis with me, and I went up there looking for Mr. Kent, and I saw he wasn't there, so I saw Mr. Pentolino, and I asked him, I said, 'Mr. Pentolino, could you take a statement?' And he said,

'Yes', and we went right in there immediately then.

* * *

"*Q*. Now, when you talked to Mr. Pentolino, were you in the presence of Louis Roberts?

"*A*. To Mr. Pentolino?

"*Q*. Yes.

"*A*. Oh, yes, he was right with me.

"*Q*. And did you brief him on what had happened between yourself and Louis Roberts?

"*A*. That is right.

"*Q*. And did you remain during the taking of the formal statement?

"*A*. That is right.

"*Q*. And who else was present during that time?

"*A*. A youth bureau officer, by the name of Joseph Yakucheck, and Detective Oliver Howell, and Stenographer Thelma Lilley took the statement."

In the absence of all evidence on the subject a confession is presumed to have been voluntarily made and when the confessor alleges the contrary he is called upon to at least rebut such presumption. *People* v. *Barker, supra*. Here there is no evidence whatsoever to rebut the presumption. The testimony of the police officer, on the contrary, supports the presumption. The motion to quash was, therefore, properly denied.

Affirmed and remanded for trial and other necessary proceedings.

CARR, KELLY, and BLACK, JJ., concurred with DETHMERS, C. J.

SOURIS, J. (*for quashal of information*). Early one morning, while still in bed, 15-year-old Louis Roberts was arrested by 2 Detroit policemen for the murder of a young woman. Testimony of 1 of the police officers of defendant's oral admissions made subsequent to his arrest constituted the only evidence offered at the preliminary examination by the

people linking defendant to the murder. From that testimony the examining magistrate found probable cause to believe the accused guilty of the murder and bound him over to the recorder's court for the city of Detroit for trial. Upon issuance of the information, defendant moved that it be quashed, which motion was denied, and this appeal was thereupon taken upon leave granted. The testimony of the admissions made by defendant was the sole basis of the people's showing of probable cause at the examination, and the resulting information cannot stand if such evidence be excluded. Accordingly, the question for decision is whether these incriminating statements were properly admitted in evidence by the examining magistrate.

In this State children under the age of 17 years are afforded special legislative immunities from, and protection against, police detention and interrogation in the manner disclosed by this record. In its wisdom the legislature has decreed that special efforts be exerted by those specially designated therefor to protect the rights of those least equipped by experience, age and physical development to protect themselves.

Chapter 12A of the probate code of 1939, PA 1939, No 288, added by PA 1944 (1st Ex Sess), No 54 (CL 1948 and CLS 1956, § 712A.1 *et seq.* [Stat Ann 1959 Cum Supp § 27.3178(598.1) *et seq.*]), provides for a juvenile division of the probate court and defines the procedures to be followed therein. Section 2* of chapter 12A of the code bestows upon the juvenile division of the probate court "exclusive original jurisdiction superior to and regardless of the jurisdiction of any other court" in any proceedings concerning any child under 17 years of age who has

* CLS 1956, § 712A.2 (Stat Ann 1959 Cum Supp § 27.3178 [598.2]).
—REPORTER.

violated any law of this State. Section 4* provides that jurisdiction may be waived by the probate court, and such waiver was accomplished ultimately in the case before us. However, prior thereto, exclusive jurisdiction remained in the probate court and the procedure for lawful detention of a juvenile is to be found in the provisions of the probate code, reference to which is made in the code of criminal procedure, CL 1948, § 764.27, as amended by PA 1958, No 212 (Stat Ann 1959 Cum Supp § 28.886), which provides:

"Sec. 27. Whenever any child under the age of 17 years is arrested with or without a warrant, such child shall be taken *immediately* before the juvenile division of the probate court of the county wherein the offense is alleged to have been committed and the officer making the arrest shall immediately make and file or cause to be made and filed, a petition against such child as provided by chapter 12A of Act No 288 of the Public Acts of 1939, as amended, being sections 712A.1 to 712A.28 of the Compiled Laws of 1948 and the said court shall proceed to hear and determine the matter in like manner as provided by said act, as amended. If, during the pendency of any criminal case against any child in any court in this State having criminal jurisdiction, it shall be ascertained that said child is under the age of 17 years, it shall be the duty of the court before whom such case is pending to *immediately* transfer such case, together with all papers connected therewith to the juvenile division of the probate court of the county wherein the offense is alleged to have been committed: Provided, however, That in any case where a child over the age of 15 years is charged with a felony the judge of probate of the county wherein the offense is alleged to have been committed, may, after investigation and examination, and upon motion of the prosecuting attorney, waive jurisdiction; whereupon it shall be lawful to try such

---

* CL 1948, § 712A.4 (Stat Ann 1959 Cum Supp § 27.3178 [598.4]). —REPORTER.

child in the court having general criminal jurisdiction of such offenses. If, during the pendency of any criminal case against any child in any court of record other than a probate court, it shall be determined that said child is 17 or 18 years of age, then the said court may in its discretion if the court finds that any of the conditions exist as outlined in subsection (d) of section 2 of chapter 12A of Act No 288 of the Public Acts of 1939, as amended, being section 712A.2 of the Compiled Laws of 1948, upon motion of the prosecuting attorney, the child or his or her representative, transfer such case together with all papers connected therewith to the juvenile division of the probate court of the counties wherein the offense is alleged to have been committed."

*Immediately* after Louis Roberts' arrest he should have been taken before the juvenile division of the probate court in response to such legislative language too concise for misunderstanding. Instead, he was taken to a police station in direct violation of still another equally concise legislative proscription. CL 1948, § 712A.16 (Stat Ann 1959 Cum Supp § 27.3178[598.16]), provides in part:

"Sec. 16. In case a child under the age of 17 years is taken into custody or detained, such child shall not be confined in any police station, prison, jail, lock-up, or reformatory, or be transported with, or compelled or permitted to associate or mingle with, criminal or dissolute persons; except that a child 15 years of age or older whose habits or conduct are deemed such as to constitute a menace to other children, or who may not otherwise be safely detained, may, on order of the court, be placed in a jail or other place of detention for adults, but in a room or ward separate from adults, and for a period not to exceed 10 days, unless longer detention is necessary for the service of process."

I cannot agree with the people's contention that *"immediately,"* as used in the statute first above

quoted, permits "a brief delay" for the purposes of booking and affording the accused "an opportunity to clear himself by a statement." Such is the construction we give the words "without unreasonable delay" as used in CL 1948, § 764.26 (Stat Ann 1954 Rev § 28.885). *People* v. *Hamilton,* 359 Mich 410. However, that is not the language chosen by the legislature for the next succeeding section with which we are here concerned. The legislature did not say that a child under the age of 17 years when arrested shall be taken "without unnecessary delay" before the juvenile division of the probate court; it said that he shall be taken there *"immediately"* and that the procedural steps (filing of a petition against such child) provided in the probate code shall be taken *"immediately."* In no event can such language be said to allow a delay for police interrogation of the arrested child *prior to* his presentment before the juvenile division of the probate court. It is the probate judge, or his designee in the juvenile division of the probate court, upon whom the legislature imposes the duty of governing and protecting a child under the age of 17 years accused of crime. That this is the legislature's commendable purpose is evident from CLS 1956, § 712A.14 (Stat Ann 1959 Cum Supp § 27.3178[598.14]), which requires the arresting officer to "forthwith notify the parent or parents, guardian or custodian" and unless immediate detention is required, to release the child to their custody upon their promise to return the child to court at a fixed time, and from CL 1948, § 712A.16 (Stat Ann 1959 Cum Supp § 27.3178[598.16]), above quoted, which places off limits to any such child under the age of 17 years any police station, prison, jail, et cetera, except on order of the probate court.*

---

* In her comprehensive report, Study of the Basic Structure for Children's Services in Michigan (American Judicature Society, 1953), Maxine Boord Virtue says, "This statute [CLS 1956, § 712A.14 (Stat

This is not to say that the legislature intended to forbid the police from interrogating children under the age of 17 years arrested for violation of law. Such interrogation may occur, but it may not be substituted for the statutory duty of taking the child immediately after arrest to the juvenile division of the probate court. This is a measure of protection which inures to a child simply because he is one. In enacting such legislation our lawmakers have afforded to juveniles rights over and above those afforded adults.

In defiance of these rights, Louis Roberts was taken from his bed and, instead of being taken to the juvenile division of the probate court as our legislature has commanded, he was taken to police headquarters where he was interrogated until he confessed to murder. The testimony of the people's own witness before the examining magistrate discloses that defendant was arrested in bed at 8:30 in the morning and taken directly to police headquarters for interrogation. Without any nourishment, he was interrogated by a detective of the homicide bureau of the Detroit police department until some time after noon of the day of arrest, at which time he confessed. During this interrogation, defendant's shoes were removed and he was required during the questioning to stand. The police detective told defendant that "he had a long time before him and he was a young man, and that he was somewhat handsome," ostensibly in an attempted play upon defendant's vanity. He was also told that it would be better for him to confess and that he would

Ann 1959 Cum Supp § 27.3178 [598.14])] is sometimes more honored in the breach than in the observance." For particulars involving both that statute and CL 1948, § 712A.16 (Stat Ann 1959 Cum Supp § 27-.3178 [598.16]), see chapter 5, § 3(a), pp 219 and 220, and appendix G, case history #6, p 354. See, also, the police procedure recommended in the pamphlet Standards for Specialized Courts Dealing with Children (U. S. Dept. of Health, Education and Welfare, Children's Bureau Publication No 346, 1954), pp 36-40.

be taken to the juvenile home. Some time during the questioning, this 15-year-old defendant was shown a nude picture of the deceased lying on the slab in the morgue. After defendant's confession to the police officer, he was taken to the prosecutor's office where, at 1:20 in the afternoon, he made a formal written confession. At no time prior thereto was defendant taken to the juvenile division of the probate court as required by the legislature, nor was there any officer of the juvenile division of the probate court present during said interrogation; furthermore, the entire interrogation took place in police headquarters for the city of Detroit, a place forbidden to children under the age of 17 years taken into custody or detained by the police; all in derogation of express rights granted defendant by the statutory provisions cited above.

In this light, the conclusions reached by the United States supreme court in *McNabb* v. *United States,* 318 US 332 (63 S Ct 608, 87 L ed 819), are applicable here. The circumstances in which the defendant's confessional statements admitted in evidence were secured reveal a plain disregard of the duties enjoined by the legislature upon law officers. A conviction resting upon evidence thus secured in flagrant disregard of the procedures which the legislature has commanded could not be allowed to stand. Neither can we allow to stand an information based upon such evidence "without making the courts themselves accomplices in willful disobedience of law." *McNabb* v. *United States, supra,* p 345.

The question is bound to arise whether we are, by depriving the prosecution of the use of confessions so procured, imposing a form of punishment upon law officers whose conduct in exacting such confessions has violated the law. Our intention is only to deprive the prosecution of the fruits of its wrongdoing. Here, we deprive the prosecution of

the use of confessional statements made to a police officer during defendant's illegal interrogation in a place of illegal detention. *Cf. United States* v. *Mitchell,* 322 US 65 (64 S Ct 896, 88 L ed 1140).

We are not required by the facts of this case to decide whether a juvenile's confession or admission obtained during interrogation before juvenile court waiver of jurisdiction is ever admissible in a criminal court proceeding. See *Harling* v. *United States* (CCA, DC), — App DC — (295 F2d 161). On that issue we reserve judgment.

The police officer's testimony of defendant's oral confession, the only evidence upon which the examining magistrate's determination of probable cause could be based, was inadmissible and, hence, the information must be quashed. Other evidence, however, may be available to the prosecution legally sufficient to support the magistrate's finding of probable cause. Consequently, I would remand for further examination proceedings before the magistrate.

I deem it appropriate to close this opinion with the following words pregnant with advice to those of our law-enforcement officers who are concerned with the preservation of our democratic ideals:

"The history of liberty has largely been the history of observance of procedural safeguards. And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law." *McNabb* v. *United States,* 318 US at p 347.

Information should be quashed. Remanded for further proceedings before examining magistrate. Costs to defendant.

Talbot Smith, Edwards, and Kavanagh, JJ., concurred with Souris, J.