[Crim. No. 4092. First Dist., Div. One. June 24, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. LAWRENCE
MAGEE et al., Defendants and Appellants.

George V. Curtis, Edward T. Mancuso, Public Defender, Joseph I. McNamara, Deputy Public Defender, Salvatore C. J. Fusco and William L. Ferdon for Defendants and Appellants.

Stanley Mosk, Attorney General, John S. McInerny, Joseph I. Kelly, Eric Collins and Albert W. Harris, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

BRAY, P. J.—Defendants appeal from judgment, after jury trial, of first degree murder and second degree robbery, and purport to appeal from denial of motion for new trial.

## QUESTIONS PRESENTED

1. Were the statements to the police free and voluntary?
2. Were the statements to the probation officer free and voluntary?
3. Instructions given and refused.
4. Should the court have reduced the degree of murder?
5. Was double punishment imposed?
6. Effect of releases to newspapers.
7. Should two jurors have been permitted to impeach the verdicts?
8. Were photographs of deceased improperly admitted?

9. Was defendant Magee improperly indicted?
10. Did Magee waive the filing of a probation report?
11. Cross-examination of Magee as to other offenses.
12. Alleged misconduct of district attorney.
13. Alleged misconduct of court.
14. Denial of motion for new trial.
15. Insufficiency of evidence.[1]

## THE FACTS

At about 12:02 a. m., April 29, 1961, Roy Giblin, operating a streetcar, was approaching the passenger loading zone located along the Municipal Railway's right of way in Dolores Park in San Francisco, when he saw a man's body on the tracks. The man was lying across the tracks with his head between one of the rails and the curbing of the platform. Giblin applied brakes, but the momentum of the streetcar carried it over the body. After an unsuccessful attempt to extricate the body, the man, later identified as William Hall (no relation of defendant Hall), died at 1:05 a.m.

Defendants Magee and Kilkenny were 16 years of age. Defendants Hall and Castillo were 17. The police picked up all defendants on May 4 and took them to the Hall of Justice. There all defendants made statements which were admitted into evidence at the trial. Additionally Magee and Hall later made statements to a probation officer, which statements likewise were admitted in evidence. Defendants Kilkenny and Magee testified in their own behalf. Defendants Hall and Castillo did not testify. Defendant Kilkenny's brother, who was with defendants on the night in question, testified, as did Anthony J. Serpa, a boy who was with defendants but remained aloof from the attack on the victim..

From the statements and from the testimony of the above mentioned witnesses, a clear picture of the facts leading up to the death of William Hall is given. Actually there is very little conflict in the evidence.

On the evening in question, defendants, along with defendant Kilkenny's younger brother, Timothy, attended a dance. While at the dance Magee became involved in a disagreement with another group of boys and defendants agreed to meet with the group at the Day Street Park for a fight. The other group did not appear at the park, and defendants then went

[1]Some of the above contentions were made by all defendants; some by individual defendants only. Where necessary they will be identified as discussed.

to a drive-in restaurant. After eating, defendants returned to the Kilkenny car and drove to Dolores Park.

During the ride, Gary Popkin, who had joined them, stated that he felt like "kicking somebody's tail." Kilkenny said something about getting a "queer." Everybody agreed. They then stopped at Dolores Park and got out of the car. Popkin and Tony Serpa walked away. Magee told Kilkenny and the latter's brother to stay by the car. Castillo, Hall and Magee then walked into the park. Shortly thereafter Kilkenny and his brother followed, stopping on top of an overpass which extends over the streetcar tracks. There they met and had a brief conversation with Castillo. Kilkenny saw Hall and Magee at the car platform about 20 feet below. Magee approached the victim, who was standing at the car stop, and asked him if he was a "queer," and said, "If you're queer we're going to take your money." The victim handed Magee his wallet and said, "What if I asked you that?" Thereupon Magee pushed the victim and Hall struck him, knocking him to the pavement. At that point Castillo came running down the stairs to the platform and jumped on the man's head. The victim was lying on the platform with one arm extended off the platform towards the rail. Magee then pulled him entirely upon the platform. Magee had put the wallet in his pocket. Hall and Castillo ran back to the car, followed shortly by Magee, leaving the victim lying on the car stop platform. The victim was apparently conscious at that time.

Kilkenny had returned to the car about the time the others approached the victim. Kilkenny started the car moving slowly. Popkin and Serpa, who had been talking to a boy in another area of the park, returned to the car. Magee, Hall and Castillo jumped in while the car was going. As the car progressed the defendants, except Kilkenny who was driving, discussed what had happened and looked at the contents of the wallet. Magee testified that the wallet contained two dollar bills and some change. He kept a dollar, gave a dollar to Hall and the change to Castillo. Some mention was made of using the man's credit card and identification card which were in the wallet. Magee put the wallet in the glove compartment of the Kilkenny car. The following day, after hearing of the death of William Hall, the defendants met, agreed upon a story to tell the police and decided to get rid of the wallet and contents, went to Golden Gate Park where they burned the cards and disposed of the wallet.

It is clear from the medical testimony that the victim re-

ceived in the affray a severe beating about the head, causing a brain injury. He also sustained a fractured clavicle. Then, either he was left on the streetcar tracks (Magee, the last defendant to see him, denied that he was; he said that the man was rolling around on the platform trying to get up), or on the platform in close proximity to the tracks. In the latter event, while in a stuporous or semiconscious condition, he either rolled or crawled on to the tracks. There he was killed by the streetcar.

### 1. *Statements To Police.*

All defendants were brought to the police department for questioning on May 4, approximately five days after the killing of William Hall, and their parents were notified of their apprehension the same afternoon.

 Generally it is contended that the statements of defendants to the police were obtained by coercion and that failure of the police to inform the defendants that their statements might be used against them and the fact that the statements were taken before the juvenile court had determined whether defendants would be tried in the juvenile court, made them inadmissible.

All statements were recorded on a tape recorder. Transcripts of the recordings were introduced in evidence and read to the jury. All counsel were offered the opportunity of listening to the recordings outside the presence of the jury. Counsel listened to one recording. On the examination of defendant Hall the recordings were played to the jury. There were certain parts of the recordings which were unintelligible. The officers testified that the transcriptions adequately reflected the discussion and the substantial accuracy of the transcripts was also testified to. Defense counsel listened to the recordings outside the presence of the jury. As said in *People* v. *Ketchel* (1963) 59 Cal.2d 503, 519 [30 Cal.Rptr. 538, 381 P.2d 394] : ''Appellants' second objection to the reading of the transcript rests on the ground of the admitted unintelligibility of parts of the recording. The fact, however, that 'a recording may not be clear in its entirety does not of itself require its exclusion from evidence, ''since a witness may testify to a part of a conversation if that is all he heard and it appears to be intelligible.'' ' (*People* v. *Dupree* (1957) 156 Cal. App.2d 60, 68 [319 P.2d 39].)''

 We will consider the statements seriatim.

*Magee's statement.*

Magee was brought to the police department from school at

noon on May 4 for questioning. He was not then placed under arrest. There he told his story to Inspector Guthrie. He was then taken to a room to which a tape recorder operated in another room was connected. He was then questioned by three police officers and a deputy district attorney. He told his story up to the time the boys arrived at Dolores Park. He then refused to talk further. The officers were persistent in their attempts to persuade him to tell the truth, pointing out that he had already talked to Inspector Guthrie. It appears from the transcription of the tape of this interview that Magee stated, as his statements were being recorded, that he felt that he should not "rat" on his friends, that he did not wish to be the first to talk but if the others talked then he would. "Get it from somebody else and then bring me in here." Inspector McDonald then said, "We're sure you'll want to talk about it later." Then a few words of the tape are unintelligible and McDonald said, "I think for the sake of safety you better cuff this boy." Magee was then handcuffed and taken to another room, where he remained handcuffed to a chair until approximately 5:30. Magee testified that during this interval he asked an unidentified police officer if he could telephone and the officer told him to "sit in that chair or he would knock my block off." Magee further testified that sometime during one of his statements McDonald said to Magee that lying wasn't helping him any and that "sooner or later we are going to get the truth, if we have to drag it out of you." This statement does not appear in the transcribing of the recordings. There are places in the recordings where the voice speaking is unintelligible. Although not specifically asked about this statement, all the officers present denied that any threats were made.

The trial judge had the opportunity of viewing Magee as he testified, and could determine whether or not to believe Magee as to the alleged threat. ■ Whether or not an admission or confession is free and voluntary is preliminarily a question for the trial court to determine. ■ Magee's protestations at the time of the first statement did not make his later statement inadmissible. (There was nothing incriminating in the first statement.) As to the later statement, the situation was somewhat similar to that in *People* v. *Middleton* (1924) 65 Cal. App. 175, 178 [223 P. 448], where the court said: "It is contended that the trial court erred in admitting in evidence the testimony of certain police officers concerning the alleged confessions of the defendant. The asserted basis of this contention is that the confessions of the defendant were not made voluntarily, and this position is predicated upon testimony that the

defendant stated, when asked about the crime, that he did not want to talk 'unless he had a hearing.' But it also appears from the testimony in the record that after making that remark and being told that his companions in the crime had confessed, he told the story without any more persuasion and without either threats or inducements being used by the officers. Upon these facts we do not think it can be said that the confession was not voluntarily made, and the following language from *People* v. *Grafft*, 61 Cal.App. 7 [214 P. 273], seems appropriate: 'The question whether the confession was "free and voluntary" or the result of inducement, coercion, intimidation or duress exerted by the officer, was one peculiarly within the province of the trial judge to decide upon the facts. His conclusion thereon has substantial support in the evidence, and we are of the opinion that we should not interfere with it.' "

Magee was returned for questioning about 5:30 p.m. The statement then taken began by Inspector McDonald stating that Magee had talked to them before. "Let's go over it again, just to see that we got everything straight." McDonald continued that after leaving the dance there was some talk about looking for a "queer" and asked Magee to tell the story from there on. Magee stated that they saw a "guy down there" and that they had seen "queers" holding a meeting there before. They went down there (to the car stop platform) and Magee said to the man, "Are you queer?" "If you're queer we're going to take your money." The man gave Magee his wallet and said, "What if I said that about you?" Magee stated, "Ever since I was a little boy I hated them and the guy referring to me as one ticked me off and I just pushed him." The other two boys, Hall and Castillo, evidently considered that as a "Go" signal "and started whaling him." Hall hit the man in the jaw with his fist. The man went down and was trying to cover up. Castillo jumped on his head with both feet. Magee grabbed the man's legs, pulling him back from where he was hanging, half off the cement. (The streetcar track was alongside this cement platform.) Castillo kicked him a couple of more times in the head. Hall and Castillo started to run. The man's right hand was now over the side of the cement although it was not touching the track. Magee dragged the man further on to the platform and asked him if he was all right. He said for Magee to leave him alone. Magee then followed the others and they all got in the car and drove away. In the car the money in the wallet was split up. Magee got a dollar and Ca-

stillo and Hall got the rest. There were two or three dollars. In the wallet there were also a couple of credit cards and the victim's driver's license and some other cards. The next morning they burned the cards in Golden Gate Park, as they agreed that they had better get rid of them. Defendant Kilkenny drove the other three to Golden Gate Park. They then went to Stow Lake and tried to sink the wallet in the lake. They pushed it under the bushes in the lake.

Magee testified that the police had not made him any promises, used any force; they just told him "that everybody else did, so I went along." Magee at no time testified that the alleged threat of the unidentified police officer, the handcuffing that he underwent, nor any alleged coercive action of the police caused him to make the recorded statement.

Defendant objected to the *method* of introducing the statement, that is, having one police officer read the questions from the transcriptions and the other read Magee's answers. There was nothing improper in this method of introducing the statement.

As to defendant Magee's contention, that this statement was involuntary, a study of the evidence fails to reveal any promises or threats made by the officers or any coercion. There are places in the tapes where the words spoken by both the officers and Magee are unintelligible. However, except in the one instance above mentioned where Magee testified that the officers threatened to drag the truth out of him, Magee did not testify that the tape did not include practically all that happened. Actually, Magee's statements to the police and to the probation officer hereinafter discussed did not vary materially from the testimony he gave upon the stand, except in one respect. In his statement to the police he said that he had told the "queer" they were going to take his money, whereas in his statement to the probation officer and in his testimony he claimed that he had not mentioned money but that the victim immediately handed him his wallet. As it clearly appeared from his own testimony as well as from the statements of the others that if the victim handed his wallet to Magee without Magee asking for money, he did so under fear, the nature of the crime would not be changed even if Magee did not ask for the money.

Magee testified that the day after the affray all of the defendants decided to tell the police if questioned that Magee had asked the victim for money, because people would think they were "nuts if we just went after the guy because he was

queer.'' When asked why he told Inspector McDonald that he had told the truth in the story that he related (this included the statement that he had asked for the victim's money) Magee responded, ''If I lied once it wasn't going to hurt to lie again.''

Magee testified that the police officers offered him no inducement to tell his story, made no promises, used no force; that Inspector McDonald was quite fair to him, that McDonald talked sincerely. He also testified that there was nothing in his statement that he would care to change, and neither in his statement nor at the trial did Magee claim that he made his statements because of coercion or promise of immunity, either express or implied.

Magee's statements were free and voluntary. The fact that the police did not apprise Magee of his right to counsel, to remain silent if he desired, or that his statements could be used against him did not render such statements involuntary and inadmissible. (*People* v. *Hoyt* (1942) 20 Cal.2d 306, 314 [125 P.2d 29].)

 It is not clear just why the officers felt it necessary to handcuff Magee in the interval between the taking of the two statements. It would seem that there was no good reason for so doing. However, it is apparent from Magee's second statement and from his testimony that the fact of having been handcuffed in nowise was responsible for his giving that statement.

 Defendant contends that any statement by a minor to the police is the result of an implied promise of immunity. We find no California case so holding. In *Harling* v. *United States* (1961) 295 F.2d 161, the defendant, 17 years of age, was arrested for assault with a dangerous weapon and robbery. He was taken into custody by the police of the District of Columbia in the evening, placed in a lineup where he was identified by the person stabbed. He was taken to the Receiving Home for Children where he spent the night. The next morning at the police department he was questioned. His statements then made were held to be inadmissible against him in the criminal trial, because, the court stated, under federal law a juvenile from the moment he commits an offense '' '. . . is exempt from the criminal law' unless and until the Juvenile Court waives its jurisdiction.'' (P. 163; footnotes omitted.) The court said (pp. 163-164) : ''Aside from the requirements of expressly applicable statutes, the principles of 'fundamental fairness' govern in fashioning procedures and remedies to serve the best

interests of the child. It would offend these principles to allow admissions made by the child in the non-criminal and non-punitive setting of juvenile proceedings to be used later for the purpose of securing his criminal conviction and punishment. Such a practice would be tantamount to a breach of faith with the child, since he cannot be charged with knowledge of either his privilege against self-incrimination or the Juvenile Court's power to waive its jurisdiction and subject him to criminal penalties. Moreover, if admissions obtained in juvenile proceedings *before* waiver of jurisdiction may be introduced in an adult proceeding *after* waiver, the juvenile proceedings are made to serve as an adjunct to and part of the adult criminal process. This would destroy the Juvenile Court's *parens patriae* relation to the child and would violate the non-criminal philosophy which underlies the Juvenile Court Act.''

The states of the union do not necessarily have to follow all federal rules. As pointed out by Mr. Justice Traynor in the recent case of *People* v. *Mickelson* (1963) 59 Cal.2d 448 [30 Cal.Rptr. 18, 380 P.2d 658], in discussing the doctrine of unreasonable search and seizure, ''The United States Supreme Court has not interpreted the Fourth Amendment as requiring that court to lay down as a matter of constitutional law precise rules of police conduct.'' (P. 451.) ''Accordingly, before a state rule governing police conduct may be struck down, it must appear that neither Congress nor a state legislature could authorize it. If a state adopts rules of police conduct consistent with the requirements of the Fourth Amendment and if its officers follow those rules, they do not act unreasonably within the meaning of the amendment although different rules may govern federal officers.'' (P. 452.)

In *Harling, supra,* 295 F.2d at page 162, the court in a footnote distinguished *State* v. *Smith* (1960) 32 N.J. 501, 545 [161 A.2d 520, 543] by pointing out that New Jersey does not follow the exclusionary doctrine of the federal courts.

There is no rule of this state making inadmissible statements made by juveniles to police officers or even to probation officers, between the time of their detention and the determination of the juvenile court as to whether they will be kept in the juvenile court or turned over for trial to the criminal courts.

We see no reason at this time for making such statements in-

---

[2]We see nothing inconsistent in the recent case of *Ker* v. *State of California,* 374 U.S. 23 [83 S.Ct. 1623, 10 L.Ed.2d 726], with the above quoted ruling in *People* v. *Mickelson.*

admissible. In determining the character of their statements, that is, whether they are free and voluntary, the age of the person should be considered, but to rule out all statements merely because of the youth of the maker, would unduly restrict law enforcement. This case is a good example of what might happen if police officers could not question juveniles concerning suspected crimes. Here was an inexcusable, horribly brutal crime, which because of the streetcar as an intervening factor, would probably have never been recognized as anything more than a streetcar accidentally killing a man, were it not for the fact that by interrogation of the boys involved the truth of the situation was determined. Permitting such statements to be used under the circumstances of this case does not violate the federal court's criteria of reasonableness in police procedure.

In *People* v. *Roberts* (1961) 364 Mich. 60 [110 N.W.2d 718], it was contended that the confession of a 15-year old boy arrested for murder was inadmissible where the confession was obtained during an interrogation by the police from 9 a. m. until 12 noon. The claim of inadmissibility of the confession was based upon the fact that the Michigan statute required that when a juvenile is arrested he be taken *immediately* before the juvenile court division of the probate court, and that the juvenile was not taken there until after the confession was obtained. The trial court admitted the confession. This action was affirmed on appeal by a split decision of the Michigan Supreme Court, four justices voting to affirm, four to reverse. The four voting to affirm felt that a delay of three hours from time of arrest until delivery to the juvenile court was still within the *immediate* requirement of the statute. The four voting to reverse felt that a delay of three hours could not be considered *immediate*. We have no such problem here. As we hereinafter point out, under section 729.5 of our Welfare and Institutions Code there was no requirement that the police officer taking a juvenile into custody take him immediately to the juvenile authorities.

*Statements of Kilkenny.*

About noon on May 4, 1961 the teacher at Kilkenny's school told him that police officers had come for him. They went out to the officers' car. Kilkenny was taken to the police department where he was interrogated by Inspectors McDonald and Guthrie. In his statement which the officers testified was given freely and voluntarily, Kilkenny stated that he drove Magee, Castillo, Hall and Tim Kilkenny to the dance in

his father's car. Popkin and Serpa joined them and they then went to the drive-in, thence to Dolores Park, where they all got out of the car. "They" said that they were going to look for "queers." Magee, Hall and Castillo went down the stairs. Kilkenny and Tim were behind them. Castillo didn't go down the stairs at first. He stayed at the top. Kilkenny heard a sound like "a slap or something." He could not see down the stairs. He was going to go down and see, but then he said, apparently to his brother, "we don't want to go there and get in any trouble" so he went back to the car and started it. Serpa and Popkin were up by the car. All the boys got in the car and they drove off. One boy said that maybe the guy was a "queer" and maybe he wasn't. They said something about a wallet, and that they had better get rid of it. Kilkenny thought that it was thrown out the car window. They said the guy didn't have much money on him. Magee said "All I did was slap him." Hall hit him and Castillo jumped on him. They said the guy was conscious lying on the platform near the tracks. They drove on certain streets and then went up to Buena Vista Park. Magee and Hall walked into the park looking for more "queers." After making this statement Kilkenny was taken home.

At 6 o'clock that afternoon Kilkenny was returned from his home to the police department, arrested, and again interviewed and his interview taped. His attention was directed to Saturday (the day after the affray) and he was asked what was said concerning the victim's wallet. The four defendants and Tim Kilkenny were present. Serpa and Popkin were not. They discussed the fact that the victim's death was in the papers and than none of them had wanted to hurt him, but that he said something or did something, so Magee and Hall hit him. They had left him lying conscious on the cement. They said they had to get rid of the wallet. They went out to the park and burned its contents. The wallet was in the glove compartment of the Kilkenny car. The wallet wouldn't burn. They then went to Stow Lake. When asked how the affair started Kilkenny said "There's too many queers in the city." In his statement Kilkenny said that he had been treated "all right" by the police.

*Defendant Hall's statements.*

Defendant Hall was brought to the police department about 12:30 on May 4 and interrogated at about 3 p.m. No promises or threats were made to him. He denied any knowledge of what happened after the group left the drive-in, claiming that he was intoxicated. He was taken into another room and there

informed that the "others had spoken the truth." He was then brought back into the interrogation room. Inspector Guthrie referred to the prior interview and said "apparently you didn't want to talk about it, is that correct?" Hall replied "Yes." Then the inspector asked questions which Hall answered without demur. The gist of his answers is that they went down to the streetcar stop where there was a man waiting for a streetcar. Magee asked the man if he was a "queer." Magee hit him with his fist. Hall struck the man with his fist once on the head. The man fell close to the track. Castillo came down and jumped on him. Hall hit the man in the leg two or three times while he was lying on the ground. Magee and Castillo were hitting him too. Hall didn't know anything about the wallet until they got back in the car. Hall then told about disposing of the wallet and its contents the next day.

Defendant Hall's main contention now is that the statements of a juvenile made prior to the determination of whether he is to be retained in the juvenile court should not be admitted. Defendant Hall's brief adds nothing to the heretofore discussed arguments made by defendants Magee and Kilkenny. Our discussion of them likewise applies to defendant Hall's case.

The statement by Inspector Guthrie to defendant Hall during his first statement, to the effect that telling falsehoods or saying that he didn't remember wasn't going to help anything, that all the officers wanted was the truth, did not amount to coercion, particularly as Hall in his statement gave no intimation that he was coerced by it. *People* v. *Brommel* (1961) 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 845], relied upon by defendant, is not in point. There definite threats were made against the defendant and an implied promise made to him.

*Defendant Castillo's statement.*

Castillo was taken into custody about 2 p.m. on May 4 at his father's gas station, in the presence of the father. He was taken to the police department. He was not given any advice as to his rights, nor were any promises, threats or force used to induce the statement. Castillo's statement as to the happenings of April 29 was substantially the same as the statements of the other three defendants and was admitted in evidence without objection. He thought that he kicked the man just once and not too hard. He was wearing tennis shoes. Castillo thought the man was fighting the other two boys. Castillo knew that they were going in the park to get some "queer" and get

his money. Castillo was drunk, having drunk about three quarts of beer about 8 or 8:30 p. m.

During the taking of the statement of Magee to the police, Castillo interrupted, stating, "Well you made no promises to me and you treated me all right."

Defendant Castillo adopted as his brief the contentions and arguments made in the Hall brief.

At the time of taking the statement of all defendants, each defendant was asked if he was making the particular statement of his own free will and if the statement was made freely and voluntarily without any promises made to him or any force used. Each defendant replied that the statement was thus made.

In *People* v. *Curry* (1950) 97 Cal.App.2d 537, 549 [218 P.2d 153], the court stated: "In *People* v. *Haney*, 46 Cal.App. 317 [189 P. 338], it was held that the admonition of police officers to a defendant that 'the truth would not hurt him, and he better come out and tell it; that they expected him to tell the truth' (pp. 322-3) could not 'be construed as an inducement to a confession of guilt.' (P. 323.)"

None of the statements of the police officers to any of the boys was any stronger than the ones in the last mentioned case.

2. *Statements to Probation Officer.* (a) *Magee.*

Magee was booked at the Youth Guidance Center on May 4, 1961, by police officers. Later petitions were filed by the senior probation officer charging him with violation of section 700, subdivision (m), Welfare and Institutions Code. A pre-detention hearing was held in the juvenile court. On May 9, after a hearing, the juvenile court ordered Magee detained in the center and a further hearing to be held on May 19, to determine whether Magee should be retained in the juvenile court or transferred to the superior court for trial. In the meantime Magee talked to his parents. Probation Officer Pebbles, over objection, testified as to statements made to him by Magee in three conversations starting with one on May 9. Pebbles testified that he made no promises to Magee and that he did not inform Magee that he did not have to make a statement nor that any statement could be used against him. Magee then related to him substantially the same story of the occurrences of the night of April 29 as Magee related in his testimony at the trial.

One of the objections raised to the admission of Pebbles' testimony was that the corpus delicti had not been established. The evidence then disclosed that the streetcar opera-

tor saw a man's body on the tracks. He was lying against the tracks with his head between one of the rails and the curbing of the stop. Although the operator applied the brakes, the momentum of the streetcar carried it over the body. After an unsuccessful attempt to extricate the body, the man died. The injuries to his torso and the lower part of the trunk were crush-type injuries, such as would be inflicted by the streetcar. The injuries to the head were not of the crush-type but rather were due to multiple impact. These injuries were consistent with the man (William Hall) having received a severe beating and with the force of a person jumping on the deceased's head. These injuries were not caused by the streetcar hitting the deceased or dragging his body along the roadbed. They were consistent with his being unconscious when struck by the car. William Hall's glasses and wallet insert were found on the ground between the rails and the loading platform about 25 feet behind the car. In that area were spots of blood, one of which appeared as though something was "yanked out of it swiftly." The only object found on the deceased's person was a key case. This evidence was sufficient to prove a prima facie case of corpus delicti, namely, that there was "a reasonable probability that a criminal act of another had been the direct cause of the death" of William Hall. (See *People* v. *Ives* (1941) 17 Cal.2d 459, 464 [110 P.2d 408].)

Pebbles testified that he refreshed his memory from a report he had made to the juvenile court, which he had compiled from notes made when he talked to defendant, which notes he had destroyed. Although defendant finds fault with this procedure, he cites no authoritites to the effect that Pebbles was not entitled to so refresh his memory.

During the trial, the attention of the court was drawn to a statement of the judge of the juvenile court made on the hearing therein, that the "proceedings" in the juvenile court could not be any part of the proceedings in criminal prosecution. No attempt was made to introduce in the trial any of the *proceedings* in the juvenile court.

 As in the case of the statements made to the police officers, defendant contends that his constitutional rights as a juvenile were violated because of the introduction of his statements made to the probation officer. Before Magee talked to Pebbles, he, as well as Mike Kilkenny and Castillo, was advised by Probation Officer Chelton that he had the right to have counsel before making statements. As we have pointed

out in our discussion of the statements made by Magee to the police, it has never been held in California that the mere fact that a juvenile is in detention awaiting determination of the juvenile court as to in what tribunal his case is to be heard makes any statements by him inadmissible in a criminal prosecution against him. In *People* v. *Curry, supra,* 97 Cal.App.2d 537, we held: "Statements made to the probation officer by a person accused of a crime upon which, with other matters, the determination of whether he is to be handled by the juvenile court or the criminal courts rests, cannot be confidential." (P. 549.) We also pointed out that while the probation officer is required to represent the interests of the juvenile when his case is heard in the juvenile court, "However, that does not mean that he is to represent him as an attorney or advocate, nor that the probation officer may conceal from the state information obtained from the person in question." (P. 549.) We see no reason to change that rule now. There is nothing in Magee's statements to the probation officer, or Magee's testimony that indicates any coercion, force, threats or promises in the obtaining of the statements.

(b) *Statements to Probation Officer—Kilkenny.*

On May 5 Probation Officer Chelton advised Kilkenny that he had the right to counsel before making any statements. No other advice was given. Kilkenny made no statement at that time. On May 8 Chelton repeated his statement to Kilkenny that he did not have to make any statement to him before being seen by counsel, and asked him if he wished to tell about what had occurred. He indicated that he did. Chelton took notes of the interview, which interview was not recorded. He did not tell Kilkenny what would be the disposition of him nor that as he was being treated as a juvenile it would be better for him to tell what happened. Kilkenny stated that in the afternoon of the day in question he, Magee and Hall went to a grocery store, where Magee stole two six-packs of beer, slipping them to Hall who carried them out to the car. Later the beer was consumed by six or seven boys in Kilkenny's car. At the dance there was a disagreement with other boys and the boys indicated that they would meet the other boys at a drive-in and have a fight. Nothing happened at the drive-in and the boys decided that it was too early to go home. Kilkenny then suggested "Let's go out and get some queers." By this he meant that they would approach a "queer" and scare him into leaving the vicinity. On four or five other occasions he and the other

boys had gone up to a person whom they assumed to be a homosexual, and antagonized him or got him to leave the area. Kilkenny stated that only once on these other occasions had he struck anybody and then only one blow. They didn't do it to get money. At Dolores Park he and his brother started to follow Magee, Hall and Castillo. However, one of the boys signalled in a manner that he thought meant for him to bring the car to the other side of the park. So he, his brother and Serpa and Popkin got into the car, which he started. The other three defendants ran up and got into the car. As they were driving someone asked if they got anybody. Someone said that they had. "He looked like a queer, so we started talking to him. Somebody asked him for his wallet, and he gave it to us." Kilkenny said that on the way back to the car he heard a noise which sounded like a slap or blow. When the victim said "How would you like it if I said that to you" Magee struck him. Hall hit him, knocking him against the wall. The victim fell and Castillo ran down the steps and kicked him in the head. After leaving Dolores Park they drove to Buena Vista Park looking for someone else to accost.

Defendant Kilkenny makes practically the same contentions concerning the admissibility of his statements to the police and to the probation officer as does defendant Magee. Our discussion hereinbefore of those contentions applies equally here. Additionally, defendant Kilkenny contends that he was denied due process of law in that the juvenile court did not immediately appoint an attorney to represent him. The public defender was appointed to represent him on the morning of the hearing at which the juvenile court determined that he should be tried in the superior court. On May 5 Kilkenny's parents knew of his arrest and they visited him a few times at the Youth Guidance Center.

As to the contention that the appointment of counsel on the morning of the hearing in the juvenile court to determine what tribunal was to hear the charges against defendant, constituted an ineffective appointment, there is no showing that counsel did not make a proper presentation of defendant's situation to the court, or that counsel was deprived of the opportunity of making any showing which might have caused the juvenile court to determine that Kilkenny was a fit subject for treatment in the juvenile court rather than in the criminal court.

While it is true that an attorney when appointed would

464

probably have advised defendant not to talk (see *Culombe* v. *Connecticut* (1961) 367 U.S. 568 [81 S.Ct. 1860, 6 L.Ed.2d 1037], to that effect) there is no requirement of law that the juvenile court appoint an attorney to represent a juvenile immediately upon the placing of a juvenile in the juvenile detention facilities. Here, the statements to the police were given prior to the attention of the juvenile court being called to the defendants in any way. There was no opportunity for the appointment of counsel before those statements were made.

Section 729.5, Welfare and Institutions Code, as it read at the time of the taking of the statements, provided, "Whenever a minor under the age of eighteen years is taken into custody by any peace officer or probation officer, such minor shall be released within forty-eight hours after having been taken into custody, excluding Sundays and nonjudicial days, unless within said period of time a petition" concerning him is filed in the juvenile court. Thus, while the police could not (and did not) place defendants in jail (Welf. & Inst. Code, § 731)[3] there was no inhibition in the law against the police questioning them, nor was there any requirement that they be taken immediately to the juvenile authorities or detention home.

It is rather strange that the counsel for all defendants at the trial of this case failed to object to the admission of the statements to the police, but seemed to place their emphasis on objecting to the statements to the probation officers, which latter statements were practically the same as those given the police. (In the Magee case the statement to the probation officer was more favorable to him than the one he gave the police.) Even assuming that because of the protective aura of the juvenile court the statements given to the probation officers should not have been admitted, no prejudice follows, as they added little, if anything, to what had been said to the police. Moreover, none of the statements varied substantially from the testimony given at the trial by defendants Magee and Kilkenny and by Tim Kilkenny. In *Culombe* v. *Connecticut, supra,* 367 U.S. 568, Mr. Justice Frankfurter well points out the fact that the law recognizes the necessity for permitting the use of confessions and admissions made to the police on questioning of guilty suspects before they have attorneys, that without their use many

[3]The 1961 amendments to sections 729.5 and 731 were not in effect at this time.

crimes would go unpunished. It is, he states, in effect, a problem of balancing this necessity on the one hand against the rights of the individual on the other. "Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly begun—but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it." (P. 571.) Mr. Justice Frankfurter also states: "The principle of the Indian Evidence Act which excludes all confessions made to the police or by persons while they are detained by the police has never been accepted in England or in this country." (Pp. 588-589; footnotes omitted.) (This doctrine is what defendants would have us apply in the case at bench.) The opinion states, in effect, that the test of admissibility is that of voluntariness, and in determining voluntariness it must be remembered that "Its first pole is the recognition that 'Questioning suspects is indispensable in law enforcement.' As the Supreme Court of New Jersey put it recently: 'the public interest requires that interrogation, and that at a police station, not completely be forbidden, so long as it is conducted fairly, reasonably, within proper limits and with full regard to the rights of those being questioned.' " (Pp. 578-579; footnotes omitted.) The opinion states further that the inferences to be drawn from all the facts as to whether or not the statements are voluntary are primarily a question for the trier of fact.[4] Applying the tests above mentioned, it does not appear that the statements made by the defendants were not voluntary. On the contrary, no defendant in the statements intimated that they were other than voluntary, and the testimony of Kilkenny and Magee, the two defendants who took the witness stand, clearly shows that their statements were voluntary.

*People* v. *Keelin* (1955) 136 Cal.App.2d 860 [289 P.2d 520, 56 A.L.R.2d 355], is not in point here, as the facts are in no way similar. In *Keelin,* the court held inadmissible testimony given by the defendant at the coroner's inquest, where he was kept in custody for some four days without being taken

---

[4]It should be pointed out that the facts in *Culombe, supra,* where the court found the confessions to be involuntary, are in nowise similar to those in our case.

before a magistrate, was denied an attorney, and was told by his custodians that the district attorney was his attorney.

In *Haley* v. *Ohio* (1948) 332 U.S. 596 [68 S.Ct. 302, 92 L.Ed. 224], where the defendant's confession was held to be involuntary, the 15-year old boy was "grilled" from midnight until 5 a. m. by the police working in relays. Further, he was held incommunicado for over three days during which time his attorney was twice denied permission to see him. Obviously there was no such situation here.

No statements to the probation officer by defendants Hall and Castillo were offered.

### 3. *Instructions.*

Defendant Magee complains about an instruction to the effect that the guilt of a defendant could not be established solely by evidence of a confession or of an admission, or both; that any confession or admission should not be considered unless from evidence independent of them the jury should find that a crime has been committed; that evidence had been admitted tending to show that defendants made statements tending to prove guilt; that a confession is a statement acknowledging conduct which, if true, discloses guilt of crime and excludes a reasonable inference to the contrary; that if the jury finds that a voluntary confession was made, it was the exclusive judge as to whether the confession was true; and in deciding that question the jury should consider all the circumstances connected with the making of the statement; the fact that the court has admitted alleged confessions of defendants does not bind the jury, which must for itself find whether they were voluntary confessions, and if not made voluntarily to disregard them. Then, unfortunately, the court stated: "The rule does not apply to a statement which does not amount to a confession, but which merely amounts to an admission. An admission received in evidence may properly be considered by the jury even though it was made involuntarily." The court then stated that a confession is not voluntary if obtained by any sort of violence or threats, or by direct or implied promises of immunity or benefit, or by any improper influence which might induce in the mind of the defendant the belief or hope that he would gain or benefit or be better off by making a statement, that if a defendant makes a confession as the result of any inducement originating with a law officer, such confession is not voluntary; that where there is a conflict in the evidence it is

for the jury to decide whether the confession was made voluntarily or involuntarily.[5]

The above quoted portion of the instructions is conceded by the Attorney General to have been erroneous. (See *People v. Trout* (1960) 54 Cal.2d 576, 586 [6 Cal.Rptr. 759, 354 P.2d 231].) Was the error prejudicial? The evidence as to the guilt of all defendants was overwhelming. The testimony of Magee and the two Kilkennys clearly establishes it. The statements of all four defendants were a combination of admissions and confessions. The jury was well advised that it could not consider involuntary confessions. As it undoubtedly found that the portions of the statements which were confessions (if not all of the statements were not that, in fact) were voluntarily given, it does not seem possible that a different verdict would have resulted had the error not been made.[6]

▉▉▉ Defendant Magee and the three other defendants offered instructions on manslaughter. These the court properly refused to give. There is no theory upon which the defendants' acts could be considered to constitute manslaughter. This is true even under defendants' theory of what occurred. While a defendant is entitled to have instructions based upon his theory of the case he is not so entitled if there is no evidence to support that theory. The evidence shows without contradiction that prior to the attack on William Hall, all defendants entered into an agreement to act in some manner towards the first person whom they might suspect to be a "queer." Under the evidence there are only three possible interpretations of what they intended to do. The first, and the one reasonably inferable from the evidence, is that they conspired to rob such a person, and the second is that if they did not intend to rob him they at least intended to assault him. ▉▉▉ Conspiracy may be considered in connection with a substantive crime, even though not separately charged. (See 1 Witkin, Cal. Crimes, § 105, p. 100; § 214, p. 205.) ▉▉▉ Under the first interpretation, the murder would be one committed in the perpetration of a felony, robbery.

Under the second interpretation, they conspired not to rob him but to assault him. This, as the court instructed, would be murder in the second degree.

The third possible interpretation is the one which defend-

---

[5] Except for the quoted portion, the instruction is correct.

[6] It is interesting to note that all defendants in their briefs refer to the tape recordings as confessions.

ants place upon the agreement of the defendants. It is that they agreed to accost a suspected "queer," merely to give him a bad time without robbing or causing bodily harm, thus not conspiracy to commit an unlawful act. They then contend that according to Magee's story, when the victim spoke to Magee, Magee hit him in the heat of passion, thus making, they claim, the crime only manslaughter. It is a little difficult, however, to reconcile such a theory with defendant Hall also striking the victim and Castillo jumping on him. Nevertheless, assuming such an interpretation, still their acts could not constitute manslaughter, because even though there were no prior arrangement, defendants Hall, Kilkenny and Castillo were guilty of aiding and abetting Magee in the robbery, for both Hall and Castillo participated in the proceeds of the robbery and Kilkenny assisted in the getaway from the scene, and all three in destroying the evidence of the robbery. So they were still guilty of murder in the first degree. Even if Magee's testimony that the moment he asked the victim if he were a "queer," the victim handed him his wallet, were true, nevertheless the crime of robbery was committed as there can be no question but that such delivery was occasioned by Magee's placing him in fear. There just is no room in this case for the claim of manslaughter.

The substance of defendant's Magee's proposed instruction No. 3 on independent and intervening cause, instruction No. 19 on credibility of the defendant, the instruction (page A-49, clerk's transcript) concerning intent, and the proposed instruction No. 24 concerning cause of death, were amply covered in the instructions given.

The court instructed that the jury must consider the evidence applicable to each offense separately from the other offenses and state its finding as to each count uninfluenced by its verdict as to any other count or defendant. We see no error in this instruction. Nor was there any error in the court's refusing to instruct that ordinarily a blow of the fist is temporary in its effect. The effect of any blow in the case was a question for the jury. (See *People* v. *McCaffrey* (1953) 118 Cal.App.2d 611, 618 [258 P.2d 557].)

In addition to claiming error in the refusal of the court to give instructions on manslaughter (we have dealt with that subject hereinbefore) defendant Hall contends that the court erred in refusing his proposed instruction No. 19 on the necessity of circumstantial evidence establishing each necessary fact in the chain of guilt. (CALJIC No. 28.) This

instruction should have been given. (*People* v. *Watson* (1956) 46 Cal.2d 818, 831 [299 P.2d 243].) However, in view of the overwhelming evidence of guilt and the fact that the court instructed that the jury could not find defendants guilty unless the proved circumstances were not only consistent with the hypothesis of guilt but were irreconcilable with any other rational conclusion, and other related instructions, the failure to give the instruction was not prejudicial. See *Watson, supra,* p. 832, holding that the failure to give the identical instruction there was not prejudicial.

Defendant Hall contends that an instruction given by the court on causal connection between the robbery and the homicide was "diffuse, ambiguous, confusing, inaccurate and argumentative." We do not find it so. The instruction is a correct one, based upon the rule set forth in *People* v. *Mason* (1960) 54 Cal.2d 164, 168-169 [4 Cal.Rptr. 841, 351 P.2d 1025]; see also *People* v. *Ketchel, supra,* 59 Cal.2d 503, 524.)

Defendant Hall's proposed instruction No. 12 concerning specific intent and proximate cause and proposed instruction No. 15 concerning reasonable doubt were fully covered by the instructions given. A party may not complain that the court did not instruct in his phraseology if the court has otherwise correctly instructed upon the subject. (*Lemere* v. *Safeway Stores, Inc.* (1951) 102 Cal.App.2d 712, 726 [228 P.2d 296].)

4. *Reduction of Degree and Dismissal of Robbery Charge.*

On motion for new trial all defendants requested the court to reduce the degree of murder and to dismiss the charge of robbery. During the discussion the court stated that it did not have authority to reduce the verdict "in a situation of this kind. Where the defendants are guilty of robbery, they are guilty of murder because of the statute in the Penal Code. I don't think this Court has any authority to reduce the verdict. If they are guilty of robbery, they are guilty of murder."

It is apparent that the court felt that in view of the fact that the murder occurred in connection with the robbery, and therefore the crime was first degree murder as a matter of law, the court could not reduce the degree. To do so the court would have had to have determined that no robbery occurred. This it was unwilling to do as undoubtedly the court felt that the jury was right in determining that a robbery did occur. In a proper case the court has the discre-

tion to consider "the question of the reduction of the class or degree of the crime" (*People* v. *Borchers* (1958) 50 Cal.2d 321, 328 [325 P.2d 97], but the court could not consider this to be a proper case for a reduction.

 Nor did the court have the authority to dismiss the robbery charge. The grounds urged for dismissal were (1) that the robbery was not proved; (2) the fact that the defendants were under 21 years of age. The court in effect found that the robbery had been proved; hence, the court had no power to dismiss a charge of which the jury found the defendants guilty and which finding the court felt was supported by the evidence. The mere fact that the defendants were under 21 would not give the court power to dismiss the robbery charge.

5. *Double Punishment.*

 However, there is a different situation existing in connection with the question of punishing defendants for both murder in the first degree and robbery, a matter not raised by any of the defendants. This results in double punishment for one act, for the reason that the act of robbery is the same act which makes the homicide first degree murder.

In *Neal* v. *State of California* (1960) 55 Cal.2d 11 [9 Cal. Rptr. 607, 357 P.2d 839], the defendant was convicted of one count of arson and two counts of attempted murder, resulting from the defendant's act of throwing gasoline into the victims' bedroom. The court ordered the arson conviction to be set aside upon the ground that otherwise the defendant would be suffering a double punishment for his one act. The court quoted from *People* v. *Knowles* (1950) 35 Cal.2d 175, 187 [217 P.2d 1] : " 'If a course of criminal conduct causes the commission of more than one offense, each of which can be committed without committing any other, the applicability of section 654 will depend upon whether a separate and distinct act can be established as the basis of each conviction, or whether a single act has been so committed that more than one statute has been violated. If only a single act is charged as the basis of the multiple convictions, only one conviction can be affirmed, notwithstanding that the offenses are not necessarily included offenses. It is the singleness of the act and not of the offense that is determinative.' Thus the act of placing a bomb into an automobile to kill the owner may form the basis for a conviction of attempted murder, or assault with intent to kill, or malicious use of explosives. Insofar as only a single act is charged as the basis for the conviction, however, the defendant can be punished only once. . . .

Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (See 2 Witkin, Cal. Crimes, p. 909.)

The robbery was a necessary ingredient of the first degree murder. Therefore, to punish defendants for the robbery and also for first degree murder would be inflicting double punishment for the same act.

This is a different situation than in *In re Chapman* (1954) 43 Cal.2d 385 [273 P.2d 817], where the defendant was convicted of first degree robbery and of assault with force likely to produce great bodily harm. There the evidence disclosed that the force relied upon to establish the robbery was different from that relied upon to establish the assault. Section 654, Penal Code, provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other. . . ." "This section prohibits the double punishment of an accused when he has committed but a single act even though such act violates two or more separate sections of the Penal Code." (*In re Chapman, supra*, p. 388.)

In *People* v. *McFarland* (1962) 58 Cal.2d 748 [26 Cal. Rptr. 473, 376 P.2d 449], the defendant was convicted, among other counts, of burglary of the second degree and of grand theft, both of the latter counts involving the defendant's taking an air compressor from inside a hospital. The Supreme Court held that the evidence fully supported the defendant's conviction on both of these counts. However, it held that as the evidence showed that the defendant entered the hospital with intent to steal and that the taking of the air compressor was the culmination of that intent, it was error to impose sentences for both the burglary and the grand theft. The burglary, said the court, even though complete before the theft was committed, was incident to and a means of perpetrating the theft. Just as in our case, the robbery was incident to and the means of causing the victim's death to be murder in the first degree. (See 2 Witkin, Cal. Crimes, pp. 904-905.) The court said (pp. 762-763) : "With respect to the procedure to be followed on appeal where double punish-

ment has been erroneously imposed, it should be stressed that section 654 proscribes double punishment, not double conviction; conduct giving rise to more than one offense within the meaning of the statute may result in initial conviction of both crimes, only one of which, the more serious offense, may be punished. (*People* v. *Chessman*, 52 Cal.2d 467, 497 [341 P.2d 679].) The appropriate procedure, therefore, is to eliminate the effect of the judgment as to the lesser offense insofar as the penalty alone is concerned.''

In *People* v. *Morrison* (1963) 212 Cal.App.2d 32, 37 [27 Cal.Rptr. 828], it was held that while the jury properly convicted the defendant of both kidnaping for the purpose of robbery and robbery, sentencing the defendant on both counts was double punishment and the sentence on the robbery count would be set aside. In *People* v. *Keller* (1963) 212 Cal.App.2d 210 [27 Cal.Rptr. 805], where the defendant was sentenced for the offense of conspiracy to commit burglary and the offense of attempted burglary, as the evidence showed that the conspiracy was not shown to have an objective apart from that involved in the attempted burglary the court ordered the sentence on the latter charge to be set aside.

In *People* v. *Rosenberg* (1963) 212 Cal.App.2d 773 [28 Cal.Rptr. 214], the defendant pleaded guilty to grand theft and also to the forgery of a fictitious name, and was sentenced upon both charges. On appeal, the court held that the defendant was motivated by but one objective and that the forgery was but an incident to and the means of perpetrating the theft. The court ordered the sentence on the grand theft charge set aside, as the forgery was subject to the greater punishment.

It is necessary that, as the robbery conviction is the lesser of the offenses of which defendants were convicted, the judgment insofar as it relates to punishment for robbery must be reversed.

In fairness to the trial court, it should be pointed out that this question of double punishment was not called to its attention. Probably the trial judge had the question of double punishment in mind, in another sense, as he ordered the sentences on the two counts to run concurrently.

6. *Releases to Newspapers.*

Defendant Magee contends that he was deprived of a fair trial because of newspaper publicity at the time of the arrest of defendants (some three months before the trial), and a newspaper article the day the trial started stating that

the trial had started with the recital by the district attorney of signed statements of the defendants. While it is unfortunate that we seem to have arrived in California at a point where criminal cases are luridly played up in the newspapers, there is no indication in this case that defendants were deprived of a fair trial. ▊ In the first place, all of the facts concerning the newspaper publicity were known to defendant at the beginning of the trial, and yet no objection to proceeding was voiced by defendant, nor was any motion for change of venue under section 1033, Penal Code, made at any time. Therefore defendant cannot now claim that it was impossible for him to secure a fair trial by an unbiased jury. (*People* v. *Cook* (1952) 39 Cal.2d 496, 500 [247 P.2d 567].)
▊ Moreover, during the *voir dire* of the jury the jurors were strictly admonished to disregard anything that they might have read concerning the case, to state whether or not they had read about it and whether they could disregard what they had read. Nine jurors admitted having read about it. ▊ They and all the jurors were closely examined by counsel in this respect and all stated that they had formed no opinion concerning the case and knew of no reason why they could not be fair and impartial jurors. The presumption is that such answers were true. (*People* v. *McCaffrey, supra,* 118 Cal.App.2d 611, 620.) ▊ Apparently none had read the magazine article referred to in the briefs. During the final instructions the jurors were admonished to be governed solely by the evidence introduced at the trial and not to base a verdict on public feeling, passion, prejudice or conjecture. There was nothing here resembling the situation in *People* v. *Brommel, supra,* 56 Cal.2d 629, cited by defendant, where the district attorney during the trial of a murder case released to the press copies of confessions and admissions before they were admitted in evidence and before they were made available to defense counsel. The court said: ''The obvious impropriety of this conduct is only emphasized by the fact that we have now determined that these statements were inadmissible against defendant on the trial.'' (P. 636.) There is nothing to indicate that the jurors did not, as instructed by the court, determine their verdicts from the evidence presented at the trial and ''not on what you may have heard or what you may have read . . .'' (See *People* v. *Santo* (1954) 43 Cal.2d 319, 331 [273 P.2d 249].) As said in *People* v. *Gomez* (1953) 41 Cal.2d 150, 162 [258 P.2d 825], ''Presumably the jurors heeded these admonitions and, upon

the entire record, we cannot hold that because of the publications mentioned the defendant was deprived of a fair trial.''

### 7. *Impeachment of Verdicts.*

 On motion for new trial affidavits of two members of the jury were filed, in which the jurors attempted to impeach their verdicts. The court refused to admit the affidavits, stating that he had read them and was satisfied that they were insufficient and inadmissible for the purpose of impeaching a verdict. One of the affidavits was to the effect that the juror neither at the time the verdict was rendered nor now believed the defendants guilty of murder in the first degree; that she did not understand the judge's instructions; that during the jury deliberations she was suffering from hypertension and unable to properly present her opinion or to insist upon further deliberations; that there was no individual deliberation on any of the defendants; and that the foreman of the jury misled her. The other juror stated that she did not believe and does not now believe defendants to be guilty of murder and that at least two members of the jury had so stated before the verdict; that several of the jurors stated that there was nothing to deliberate upon as the judge's face indicated that he did not believe the boys; that she, too, was misled by the foreman into not deliberating upon the defendants individually and as to the law; that when the jury was polled in court this juror was upset and did not know what was actually taking place.

It is well settled that there are only two exceptions to the rule that the affidavits of jurors cannot be used to impeach the verdict. *(People* v. *Sutic* (1953) 41 Cal.2d 483, 495 [261 P.2d 241].) One is where assent to a verdict was had ''by a resort to the determination of chance.'' (Code Civ. Proc., § 657, subd. 2.) The other is where the bias or disqualification of a juror was concealed by false answers on *voir dire* examination. *(People* v. *Castaldia* (1959) 51 Cal.2d 569, 572 [335 P.2d 104].) As the affidavits here come within neither category, the court's action in refusing to consider them was proper.

It should be pointed out that the jury returned to court and asked that instructions on certain subjects be reread to them. After reading them the court asked ''Does that answer your questions?'' The foreman replied that it did. No juror indicated dissent or that he or she was dissatisfied with the

proceedings in the jury room. All jurors on being polled stated that the verdicts were theirs.

8. *Photographs of Deceased.*

Defendant Magee complains of the admission of certain photographs of deceased's body, contending that they are gruesome, prejudicial and of no probative value. Two are of deceased's head, two of his torso. In offering them the district attorney explained that the doctor would use them to illustrate the difference between the injuries to the head and to the body, which the doctor did. This was a vital matter in the case, as one of the crucial questions was whether the head injuries could have been caused by the streetcar hitting the victim or dragging his head along the roadbed. We have examined the photographs and it plainly appears that their value in being used by the doctor to point out the difference between the injuries to the head and to the body, far outweighs the effect of their gruesomeness. While the photographs are not pleasant to view, they are not unduly gruesome. The difference in the type of injuries is readily apparent. The court did not abuse its discretion in admitting the photographs. "When allegedly gruesome photographs are presented, the trial court in the exercise of its judicial discretion must decide whether their probative value outweighs their possible prejudicial effect." (*People* v. *Atchley* (1959) 53 Cal.2d 160, 168 [346 P.2d 764] ; *People* v. *Brommel, supra,* 56 Cal.2d 629, 636; *People* v. *Harrison* (1963) 59 Cal.2d 622, 627 [30 Cal.Rptr. 841, 381 P.2d 665].)

9. *Indictment.*

Defendant Magee contends that he was indicted without probable cause. Defendant has not seen fit to bring before us the proceedings in the grand jury. We therefore cannot consider this contention. (See *People* v. *Northrup* (1962) 203 Cal.App.2d 470, 477 [21 Cal.Rptr. 448].)

10. *The Probation Report.*

Although defendant Magee in effect requested sentence without waiting for a probation report, he now contends the court erred in sentencing him without such a report. At the time of sentencing, the court stated that it had been informed by the probation officer that each of the defendants on advice of counsel had refused to discuss his case with the probation officer and consequently no report had been prepared. The court was of considerable doubt after reading section 1203, Penal Code, as to whether any defendant would

be eligible for probation. The court stated that he did not want it claimed that the defendants were eligible for probation and that the matter had not been considered by the court, that section 1203 was not a model of clarity and that it was up to counsel as to whether sentence should be made now or a report should be awaited. Magee's counsel stated that it would take at least three weeks for a report and that "we are willing that judgment be pronounced today." The counsel for the other three defendants agreed also. This action constituted a withdrawal of the application for probation and a waiver of the requirement that a probation report be had before sentence. Under the circumstances there was no error in the court's proceeding to sentence without a probation report.

11. *Evidence of Other Offenses.*

The probation officer related a statement made to him by Magee concerning the stealing of two six-packs of beer on the afternoon preceding the William Hall affair and also a statement concerning an occasion when Magee and friends saw a person whom they believed to be "odd" and they "scared" him. Defendant Magee characterizes the admission of these statements as error.

Defendant did not object to this testimony. His only objection was that the statement read by the probation officer was dictated sometime after the conversation with Magee had taken place. The officer stated that it was a correct transcription of his conversations with Magee. Not having objected to the fact that the statement referred to other occasions it is too late to do so on appeal. (See *People* v. *Howard* (1957) 150 Cal.App.2d 428, 430 [310 P.2d 120]; *People* v. *Kelsey* (1956) 140 Cal.App.2d 722, 723 [295 P.2d 462].) The same is true of other testimony which defendant now contends should not have been admitted, but to which he entered no objection.

12. *Alleged Misconduct of District Attorney.*

In his examination of Probation Officer Pebbles, the district attorney asked if Pebbles had had some conversation "pertaining to a queer hunter's club." The witness said not that he could recall. The district attorney again asked a similar question. The court promptly sustained defendant's objection. The fact that defendant did not think the matter serious enough to ask for an instruction to the jury indicates that there was no prejudice in the district attorney's questioning.

"Reversible error does not flow from an irrelevant question nipped in the bud by a sustained objection." (*People v. Ramsey* (1959) 172 Cal.App.2d 266, 273 [342 P.2d 287].)

Defendant Magee contends that certain questions asked of him on cross-examination which defendant answered were improper. Defendant made no objection to the questioning. He cannot complain for the first time on appeal. (See *People v. Shannon* (1956) 147 Cal.App.2d 300, 303 [305 P.2d 101].)

13. *Alleged Misconduct of Court.*

Defendant Magee cites four instances in which the court briefly asked questions of certain defendants and contends that they were asked in a manner suggesting that the court did not believe them. The record indicates no improper action of the court. The court apparently was merely attempting to clear up points otherwise obscure. This the court had the right to do. (*People v. Mendez* (1924) 193 Cal. 39, 46 [223 P. 65].)

14. *Denial of Motion for New Trial.*

As we have shown, there was no error in the court's refusing to grant a new trial because of the jurors' affidavits. Additionally, Magee contends that a new trial should have been granted because of his failure to cross-examine Inspector McLennan. As he admits the failure to cross-examine McLennan was through no fault of either the court or the prosecution, defendant's inadvertence in failing to cross-examine McLennan or to ask that he be recalled for cross-examination could not constitute grounds for a new trial.

15. *Insufficiency of Evidence.*

Defendant Kilkenny contends that the evidence was insufficient to prove him guilty of either charge. This contention is based primarily upon Kilkenny's testimony to the effect that the defendants never intended to rob and that Kilkenny was not present in the immediate area of the assault upon the victim, William Hall. However, the evidence fully supports the implied finding of the jury that the defendants conspired to rob a "queer" and beat up a "queer" and that in any event Kilkenny aided and abetted the other defendants. The evidence, including the testimony of Kilkenny and his brother, shows the following: Kilkenny supplied and drove the car used in the night's adventure and the disposal of William Hall's wallet and contents the next day. Kilkenny testified that he suggested that they go "queer hunting." By

that he meant to "[s]care them out of our neighborhood." He testified that when they stopped at Dolores Park he and his brother Tim waited after the others had left the car. He then suggested to Tim that they go to see what the others were doing. He saw Castillo and down by the bridge he saw Magee and Hall. He started back to the car when he heard what sounded like a slap. (Tim testified that he saw the victim slapped by Magee and slugged by Hall, and Castillo start down the steps to the platform.) He then ran back to the car to make sure it would still be working. He started up the car. The other three boys came running and jumped in while the car was moving. On a previous occasion Kilkenny had hit a person whom he thought to be a "queer." After leaving the park the boys talked about what they had done at the car stop and the wallet was passed around, although Kilkenny did not handle it. He then drove to Buena Vista Park "[t]o see if we could scare another queer." That night Kilkenny stopped for gas at a service station. All the defendants chipped in to pay for it. The next day defendant Kilkenny suggested that they get rid of the wallet and contents. He drove the others to Golden Gate Park to "get rid of the stuff." The others got out of the car and burned the wallet's contents. They got back in the car but had not yet got rid of the wallet. Kilkenny suggested that they go look for another place. He then drove to Stow Lake where they hid the wallet. Kilkenny and the others told Popkin and Serpa to tell the police, if asked, that the defendants went into the park to get gas money.

While the defendants all contend that they had not agreed to rob the victim, it is a reasonable inference from the evidence, and one presumably drawn by the jury, that robbing a "queer" was contemplated by all when they agreed to go "queer hunting." They contended that the story given to the police to the effect that they intended to rob a "queer" was one they made up as they thought it would sound well. However, the jury could reasonably have believed that the story was true. Moreover, the fact is that they actually did rob the victim, from which circumstance alone it could be inferred that they conspired to rob him.

It is clear that Kilkenny, although not immediately present at the attack upon the victim, conspired with the others to rob him, and also aided and abetted in the acts of the other defendants. As pointed out in 1 Witkin, California Crimes, page 46, "there are no accessories before the fact, nor second

degree principals, in California." In *People v. Young* (1933) 132 Cal.App. 770 [23 P.2d 524], it was held that a woman who aided and abetted a pimp was properly convicted of pimping although the statute referred only to "[a]ny male person . . ." Section 31, Penal Code, provides in part: "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." "One may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it." (*People v. Villa* (1957) 156 Cal. App.2d 128, 134 [318 P.2d 828] ; *People v. Fleming* (1961) 191 Cal.App.2d 163, 168 [12 Cal.Rptr. 530].) In *People v. Grischott* (1951) 107 Cal.App.2d 631 [237 P.2d 712], the defendant claimed that she did not conspire with her codefendants to commit burglary. However, she drove them to the burglarized store and then returned for them. Although the defendant contended that she did not know the real intentions of her codefendants the court held that she was properly convicted of burglary, saying: "The jury might well have believed that she had full knowledge of the intention of her associates and that she was aiding and abetting them, not only in the commission of the act, but aiding them in escaping from the scene of the crime after its commission." (P. 634.) The same can be said of defendant Kilkenny. Moreover, defendant Kilkenny helped the others dispose of the incriminating evidence. (See *People v. Ellenberg* (1958) 165 Cal.App.2d 495 [331 P.2d 1053], where the defendant helped the codefendant killer dispose of the gun used in the killing.)

For the reasons hereinbefore set forth, the judgment is reversed insofar as it imposes sentences for robbery. In all other respects the judgment is affirmed. The purported appeals from the order denying new trial are dismissed.

Sullivan, J., and Molinari, J., concurred.

The petitions for a rehearing were denied July 17, 1963, and appellants' petitions for a hearing by the Supreme Court were denied August 20, 1963. Peters, J., and Peek, J., were of the opinion that the petition should be granted.